<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,           )  No. 24 CR 153
 4                                        )
                   vs.                    )  Chicago, Illinois
 5                                        )
     ADAM STAFFORD KING,                  )
 6                                        )  March 26, 2024
                        Defendant.        )  1:46 p.m.
 7

 8                       TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HON. KERI L. HOLLEB HOTALING, MAGISTRATE JUDGE
 9

10   APPEARANCES:

11   For the Government:    MR. BRENDAN D. STONE
                            MR. AMARJEET S. BHACHU
12                          United States Attorney's Office,
                            219 South Dearborn Street, Room 500,
13                          Chicago, Illinois  60604

14
     For the Defendant:    MR. JONATHAN S. BEDI
15                          Bedi & Singer, LLP,
                            53 West Jackson Boulevard, Suite 1101,
16                          Chicago, Illinois  60604

17

18

19

20

21

22
                            PATRICK J. MULLEN
23                        Official Court Reporter
                        United States District Court
24            219 South Dearborn Street, Room 1412
                        Chicago, Illinois  60604
25                          (312) 435-5565
</pre>

1     (Proceedings in open court.)

2          THE CLERK:  24 CR 153-1, U.S.A. versus Adam King.

3          THE COURT:  Good afternoon.  Could I please have

4  appearances for the record?

5          MR. STONE:  Good afternoon, Your Honor.  Brandon

6  Stone on behalf of the United States.  I'm joined at counsel's

7  table by my colleague, Amar Bhachu.

8          THE COURT:  Good afternoon.

9          MR. BEDI:  Good afternoon, Your Honor.  I'm Jonathan

10  Bedi.  I represent Adam King.

11          THE COURT:  Good afternoon, Mr. Bedi.

12          Okay.  So we're here on the detention hearing.  I

13  have received a pretrial services report.  Did the Government

14  also receive that report?

15          MR. STONE:  Yes, Your Honor.

16          THE COURT:  And did the defense?

17          MR. BEDI:  Yes, Your Honor.

18          THE COURT:  Okay.  I have in court with me also a

19  representative from pretrial.  Can you identify yourself for

20  the record as well?

21          MS. TRAMONTE:  Good afternoon, Your Honor.  Carla

22  Tramonte, pretrial services, and I have one correction for

23  that report.

24          THE COURT:  Okay.  Could you please let me know what

25  that correction is, Ms. Tramonte?

```
 1              MS. TRAMONTE:  On page 4 in the financial chart --
 2              THE COURT:  Can you just speak into the microphone?
 3              MS. TRAMONTE:  Yes.  On page 4 in the financial chart
 4   towards the middle of the document, there's an indication of
 5   monthly income.  I have listed his yearly income.  So the
 6   numbers are skewed.
 7              THE COURT:  Okay.  For both of the salary amounts, is
 8   that right?
 9              MS. TRAMONTE:  Correct, his main employment and his
10   extra employment.
11              THE COURT:  Okay.
12              MS. TRAMONTE:  Thank you.
13              THE COURT:  All right.  So those are the annual
14   amounts and not the monthly amounts.
15              MS. TRAMONTE:  Yes, Your Honor.
16              THE COURT:  Which I understand because that's
17   consistent with the front page.  On page 1, his approximate
18   monthly income is listed as $60,000 a month, correct?
19              MS. TRAMONTE:  Yes, Your Honor.
20              THE COURT:  Okay.
21              MS. TRAMONTE:  Thank you.
22              THE COURT:  Well, thank you for making that
23   correction on the record.  I appreciate that.
24              Okay.  All right.  I also have a motion for pretrial
25   release from custody that was filed by defense yesterday.  I
```

1    believe that's docket number 10.  And then just almost late --

2              MR. STONE:  My apologies, Your Honor.

3              THE COURT:  When I was reading prior to coming out on

4    the bench, I have a Government response to defendant's motion

5    for pretrial release from custody.  That's document number 14.

6    I've reviewed those filings quickly, I will say, as to the

7    Government's.  I appreciate that you filed a written response,

8    but it will be helpful for me obviously to hear argument here

9    in court to kind of -- because I had to go through that very

10   quickly.

11             So with that, maybe we can start with the Government

12   in terms of your position.  Can you state that for the record?

13             MR. BEDI:  Your Honor, if I may.

14             THE COURT:  Yes.

15             MR. BEDI:  Just logistically, I have three witnesses

16   I'd like to call before argument.

17             THE COURT:  Okay.

18             MR. BEDI:  So I don't know if you -- just where in

19   the order you want to do that, if you want me to do that now

20   or wait for the Government.

21             THE COURT:  I mean, I kind of wanted to hear from the

22   Government, you know.

23             MR. BEDI:  Fair enough.

24             THE COURT:  I spent much more time with your filing.

25   I literally received their filing in the last 25 minutes, so

1   I'd actually like to hear from them because some of it is in

2   response to what you've filed already, Mr. Bedi.  So I would

3   like to hear from them first if that's okay.

4           MR. BEDI:  Fair enough.

5           THE COURT:  Go ahead.

6           MR. STONE:  Thank you, Your Honor.

7           I do first want to apologize for the late filing.  I

8   did want to ask.  Did Your Honor receive the exhibits, the

9   redacted exhibits that I sent to your chambers and to defense

10  counsel?

11          THE COURT:  I did.  I did get to look at those on my

12  computer screen.  I didn't print them out.  I know they were

13  in color, and I thought -- well, I did get to review them,

14  though, on my screen, yes.

15          MR. STONE:  Okay.  They're cited throughout the

16  brief --

17          THE COURT:  Yes.

18          MR. STONE:  -- that Your Honor referred to at docket

19  14.

20          Regarding detention in this case, Your Honor, so just

21  to lay the groundwork for the legal standard here, this is a

22  presumption case because of the offense that defendant is

23  charged with, and that means there's a rebuttable presumption

24  that there are no conditions that can ensure the appearance of

25  the defendant and the safety of the community.

1          Your Honor, the Government, as it outlined in its

2    brief, frankly, we do not believe that the defendant has met

3    the burden of production to rebut that presumption of

4    dangerousness here.  Your Honor, in reviewing the proposal

5    outlined by defense counsel, there's a laundry list of

6    conditions that they propose to include a third party

7    custodian, and they note his strong ties to the community,

8    family, things like that.  As the defendant -- as the

9    Government noted in its brief, most of those already existed

10   when the defendant was committing this offense, so they really

11   do nothing to rebut the presumption.

12         As to the imposition of a third party custodianship

13   involving the defendant's parents, as I understand it, the

14   defendant's husband will move to his parents' house where he

15   will receive this child here any day now, and the defendant

16   will move back into his own house and his parents will move in

17   with him.

18         This is -- frankly, like this is not appropriate.

19   The defendant, defendant's parents can't really monitor his

20   Internet access.  I understand that they've said they'll cut

21   the Internet at the house.  As Your Honor knows, there are

22   many, many different ways to access the Internet aside from

23   your house.

24         And more importantly, Your Honor, defense counsel

25   doesn't even impose any real restrictions on his daily

1  activities.  There's no curfew.  There's no confinement.  So

2  they haven't even rebutted the presumption in this instance,

3  Your Honor.

4          Then just turning to the 3142(g) factors here, Your

5  Honor, the nature and circumstances of the defense -- or of

6  the offense here, as we discussed last week on Friday, this is

7  heinous, heinous conduct here.  First of all, just the offense

8  conduct itself, distributing child porn, knowingly

9  distributing child pornography is heinous conduct in its own

10 right.

11         But then the statements made by the defendant,

12 repeated statements about past abuse, the rape of a

13 four-year-old approximately two years ago, apparently he met

14 his father on Scruff is what he said in those chats.  He also

15 made statements about abusing nieces and nephews, that he

16 would drug them with Benadryl.  Your Honor, these are not sort

17 of anodyne statements.  These are specific:

18         "I used two doses, I can't send him home damaged."

19         It's because the defendant doesn't want to be caught.

20 And finally, the defendant, he was going to California this

21 week.  If the FBI had not stepped in and arrested him on the

22 complaint that Your Honor signed, he would be in California

23 right now to receive an infant that --

24         THE COURT:  Tomorrow, I think, right?

25         MR. STONE:  -- right, that he planned to abuse --

```
 1            THE COURT:  March 27th, I think.

 2            MR. STONE:  -- in explicit terms.  He repeatedly said

 3     this, and he talked about inviting someone else to abuse it.

 4     Your Honor, I cannot imagine a more vulnerable victim than an

 5     infant, who cannot report that he or she was abused, who

 6     cannot do anything to fight anyone off.  It's abhorrent, Your

 7     Honor.

 8            Your Honor, the other 3142 factors also militate

 9     towards detention here.  The history and characteristics of

10     the defendant here, as the Government noted, in 2017 Aurora

11     police came to the defendant's house and met with him and his

12     husband, and they discussed the downloading of child

13     pornography, what appeared to be child pornography.  They said

14     they weren't sure based on reviewing it whether it was, but it

15     appeared to be, and that somebody at the house had a problem.

16            With full knowledge of that and then with the

17     execution of a search warrant at the house, defendant's

18     husband was still going to fly with him to California to go

19     get this child.  The FBI put some of those text messages in

20     front of the defendant's husband and said -- the FBI agent

21     said the defendant's husband didn't really want to read them

22     or couldn't finish them but was still going to California to

23     get this child.

24            I don't -- from the Government's perspective, this

25     prosecution is not an inconvenience to their plans.  This is a
```

1   very serious criminal matter, and the fact those plans were

2   not changed, were not adjusted, were not even impacted at all,

3   should tell the Court something about what's going on with the

4   family dynamics here.  I don't claim to know all those

5   dynamics, Your Honor, but I can -- the Government can tell you

6   based on what we've reviewed here that the husband is

7   completely financially dependent upon the defendant and the

8   defendant is able to do as he pleases.  So, Your Honor, the

9   Government believes that detention is the only appropriate

10  remedy here.

11          I want to address a couple points in defense

12  counsel's brief that was filed yesterday.  First, there's a

13  reference to a forensic psychologist report.  The Government

14  has never seen that.  I don't believe it was filed.  I don't

15  know anything about that, Your Honor.

16          There's a policy discussion throughout that brief.

17  Your Honor, respectfully, none of that is relevant to the

18  detention determination here.  All that is relevant is

19  Congress's dictates in 3142(g) that the Court review the facts

20  and apply those factors.

21          Defense counsel says that, you know, 98 percent of

22  federal defendants on bond don't commit criminal offenses.  I

23  actually think that's a great statement of how well the

24  3142(g) factors work, because when courts step in and detain

25  dangerous defendants and release defendants with appropriate

1    safeguards where they're not dangerous, that's great.  98

2    percent don't commit criminal offenses.  Your Honor, this is

3    not that case.

4         And so, Your Honor, respectfully, after reviewing the

5    evidence that Your Honor has seen both in the complaint, in

6    the exhibits, in the filing by the Government, and in the

7    filing by defense counsel, as I noted or as the Government

8    noted in its brief, you know, one of the letters discusses

9    Broadway plays.  The defendant made countless references to

10   Broadway plays in these chats with the FBI OCE about going to

11   plays in New York.

12        Your Honor, there is very little doubt that this is

13   the defendant who's sending these chats, who sent the child

14   pornography, and who made these statements about abusing

15   children in the past and plans to abuse children in the

16   future, and for those reasons, Your Honor, the Government is

17   still seeking detention here and submits that detention is the

18   only appropriate remedy.

19        THE COURT:  Thank you.  Can I ask you one thing?

20   There's a case that the defense cited in their brief.  It's a

21   Southern District of Illinois case, United States versus

22   Monfre.  I don't know if you've had a chance to look at that.

23   I know you cited other caselaw, and I appreciate the caselaw

24   being cited to me.  So I like the written submissions.  I

25   don't know if you've had a chance to look at that, Mr. Stone,

1    and if you'd want address that case.  Maybe I'll go to the

2    witnesses, but then I'd like to hear from the Government about

3    that case as well.  Okay?  But I don't want -- you know, we

4    have witnesses here.  I can move on to that and then come

5    back.  Okay?

6                MR. STONE:  Okay.

7                THE COURT:  All right.  So, Mr. Bedi, I'm ready for

8    you.  I don't know if you want to address his argument first

9    or you want to go to the witnesses, as you suggested.

10               MR. BEDI:  Judge, I'll go to the witnesses first, and

11   then I obviously have some response to the Government.

12               THE COURT:  Yes, I'm sure you do.

13               MR. BEDI:  I'd like to call Lucas King, please.

14               Judge, where would you like Mr. King?

15               THE COURT:  I mean, are you going to put him under

16   oath?

17               MR. BEDI:  Yes.

18               THE COURT:  Then let's put him here on the witness

19   stand.

20      (Brief pause.)

21               MR. BEDI:  Judge, would you like me to remain seated?

22               THE COURT:  Wherever you're most comfortable, just so

23   you're by the mike.

24               THE CLERK:  Please raise your right hand and state

25   and spell your last name for the record.

**L. King - direct**

1          THE WITNESS:  Lucas, L-u-c-a-s, King, K-i-n-g.

2     (Witness duly sworn.)

3          LUCAS KING, DEFENDANT'S WITNESS, DULY SWORN,

4                    DIRECT EXAMINATION

5   BY MR. BEDI:

6   Q.  Mr. King, in a loud, clear voice, could you state and

7   spell your name?

8   A.  Lucas King, L-u-c-a-s, K-i-n-g.

9   Q.  And how old are you?

10  A.  I'm 40 years old.

11  Q.  And how do you -- or do you know Adam King?

12  A.  I do.

13  Q.  And how do you know him?

14  A.  He's my husband.

15  Q.  And how long have you been married?

16  A.  We've been married since 2016.

17  Q.  And you are expecting a child through surrogacy, is that

18  correct?

19  A.  That's correct.

20  Q.  And you and your mother plan to leave this week to get the

21  baby.  Is that fair?

22  A.  That is also correct.

23  Q.  Okay.  And in the last few days, I've discussed -- we've

24  discussed a release plan for Adam if the Court grants his

25  release, correct?

**L. King - direct**

13

1   A.  That is correct.

2   Q.  And you would move out of the house?

3   A.  I've already moved out of the house, Adam's and my house,

4   yes.

5   Q.  Right.  And just for clarification, we'll call that the

6   Hughes Road house.

7   A.  Okay.

8   Q.  So you've moved out of the Hughes Road house, correct?

9   A.  That's correct.

10  Q.  And so the plan would be for you to bring the baby back to

11  your parents' house?

12  A.  That is correct.

13  Q.  And you are aware that if Adam were to be released, he

14  would have no contact with the minor child and any minors

15  under the age of 18?

16  A.  That's correct.

17  Q.  And what would you do if you learned that Adam had contact

18  with either the minor child or a child under the age of 18?

19  A.  I would immediately call the police, and I would call the

20  pretrial services number.

21  Q.  Okay.  And so you would report Adam.

22  A.  Yes, I'm a mandated reporter in Illinois.

23  Q.  And you would do that even knowing that it would almost

24  certainly result in him going back into custody.

25  A.  Absolutely.  The safety of our child is 100 percent my

L. King - direct

1   highest priority.

2   Q.   Okay.   The Internet in the Hughes Road house, whose name

3   is that Internet under?

4   A.   That's in my name.

5   Q.   And you'd be willing to cut that Internet.

6   A.   Yes, absolutely.

7   Q.   In terms of the Internet devices in the Government's

8   discussion, are there other Internet-capable devices in the

9   home?

10  A.   No.

11  Q.   And if you learned that there was another Internet-capable

12  device in the home, what would you do?

13  A.   I would again immediately call the police and pretrial

14  services.

15  Q.   All right.   In terms of the financial situation in the

16  home, who manages the finances?

17  A.   I do.   I control all the finances.

18  Q.   Okay.   And you would be willing to take any credit cards,

19  debit cards, checkbooks, anything like that?

20  A.   Yes.

21  Q.   And you'd be willing to put an alert on your phone so you

22  would know if Adam bought a plane ticket, a train ticket --

23  A.   Absolutely.

24  Q.   -- or a bus ticket.

25  A.   Yes.

**L. King - cross**

1   Q.  Okay.  And you'd be willing to report any violations of

2   any court order to pretrial and to the police.

3   A.  Yes, immediately.

4   Q.  And you're aware that these are very serious allegations.

5   A.  I am aware.

6   Q.  And you're aware of the severity of what Adam is looking

7   at.  Is that fair?

8   A.  I'm aware.

9           MR. BEDI:  Judge, I don't have anything further.

10          MR. BHACHU:  May I inquire, Judge?

11          THE COURT:  Yes.

12          MR. BHACHU:  Thank you.

13                      CROSS-EXAMINATION

14  BY MR. BHACHU:

15  Q.  Sir, my name is Amar Bhachu.  I'm an assistant United

16  States Attorney assigned to this case.  I have just a couple

17  quick questions.

18          Sir, have you traveled to New York with your husband

19  before?

20  A.  Yes.

21  Q.  Can you tell us when you traveled to New York with your

22  husband?

23          MR. BEDI:  Judge, objection.  This is not relevant,

24  and it's outside the scope.

25          THE COURT:  This is about -- you wanted to put him on

1   as a witness.  They clearly have raised issues about these

2   trips to New York.  It's something that's in the complaint.  I

3   mean, I'd like to hear what he says.  I mean, you put him on

4   on the stand.  I'd like to hear what he says about the trip to

5   New York.  I mean, there's a recent one as far as I

6   understand.

7   BY THE WITNESS:

8   A.  Could you repeat the question?

9   BY MR. BHACHU:

10  Q.  Have you traveled with your husband to New York before?

11  A.  Oh, yes, yes.

12  Q.  Can you tell us when?

13  A.  The most recent trip was January 2024.  Prior to that, I

14  would have to look up the dates to be specific with you.  I

15  wouldn't want to say something incorrect while on the stand.

16  Q.  And what was the purpose of your trip in January of 2024?

17  A.  To take in the city.

18  Q.  And in terms of taking in the city, did you attend any

19  theater productions at all?

20  A.  Of course.

21  Q.  Which theater productions do you recall attending?

22  A.  I know we saw one called The Connector, but honestly I

23  can't recall at this moment the names of the other ones we

24  saw.

25  Q.  How many approximately shows did you see when you went to

1    New York in January of 2024?

2    A.  I would struggle to give an approximation.  Again, I don't

3    want to be inaccurate and, you know, say something incorrect.

4    Q.  Okay.  How long approximately were you in New York when

5    you went on that trip to take in the city?

6    A.  The closest I could say was several days.

7    Q.  Besides your husband, was anybody else present for that

8    trip?

9    A.  If you could be more clear about what you mean by

10   "present"?

11   Q.  Did anybody else travel with the two of you?

12   A.  No.

13   Q.  Did you meet anybody in New York when you went on that

14   trip?

15   A.  Well, we always catch up with friends while we're in the

16   city.

17   Q.  Okay.  And was it for dinner or something like that?

18   A.  We -- I would struggle to recall exactly what we did with

19   our friends but, yes, I'm sure we had a meal or two with

20   friends.

21   Q.  Can you recall what friends you had a meal or two with?

22   A.  So, I mean, yes, I remember at least one friend.

23   Q.  And what was that person's name?

24   A.  Her name was Ann Quintero.

25   Q.  Could you spell that last name?

```
 1   A.   I believe it's Q-u-i-n-t-e-r-o.

 2   Q.   Anybody else that you recall meeting with?

 3   A.   We went to an event with a gentleman named Bill Ellis.

 4   Q.   What was the nature of that event?

 5   A.   That was the AKC Meet the Breeds greet event.

 6   Q.   And AKC, is that a reference to the American Kennel Club?

 7   A.   It is.

 8   Q.   Okay.  And your husband is affiliated with that

 9   organization, is that right?

10   A.   I'm not sure what you mean by "affiliated."

11   Q.   Does he act as a judge for certain --

12   A.   Yes.

13   Q.   -- of the competitions?

14   A.   Yes.

15   Q.   Okay.  That's what I mean.

16   A.   Okay.  I didn't know if you meant employed.

17   Q.   All right.  So on this trip to New York in January 2024,

18   during the course of that trip, were you aware that your

19   husband was corresponding via Telegram with an individual that

20   had identified themselves as a "perv," p-e-r-v?

21   A.   Are you alleging that he did that?

22   Q.   I'm asking you if you have any knowledge about that.

23   A.   I have no knowledge of my husband ever having any

24   communications with somebody like that.

25   Q.   Okay.  Were you aware that he was exploring the
```

L. King - cross

1  possibility of meeting up with that individual during the trip

2  to New York while he was there with you?

3  A.  I have no knowledge of my husband ever setting up anything

4  like that, and when we travel to New York we're together all

5  the time.

6  Q.  So it's fair to say he never said anything to you about

7  any sort of activity along those lines, is that correct?

8  A.  Correct, and I've never seen any evidence saying that he

9  would do that.

10  Q.  Okay.  You don't have access to his -- or you didn't have

11  access to his telephone at all times, did you, sir?

12  A.  No, I don't use his telephone.

13  Q.  Okay.  Was it password-protected?

14  A.  Yes, his phone is password-protected.

15  Q.  Okay.

16  A.  So is mine.

17  Q.  Were you aware that he was potentially exploring the idea

18  of meeting up with this individual for purposes of, you know,

19  going for a drink with that individual?

20  A.  No, I'm not aware of my husband setting up any situation,

21  social or otherwise, that I would not be present for.

22  Q.  Sir, I hate to ask this question, but I must.  Are you

23  familiar with your husband being unfaithful to you ever during

24  the course of your marriage?

25  A.  I'm not.

```
 1              MR. BEDI:  Objection, relevance.
 2              MR. BHACHU:  The relevance here, Judge, is to
 3    demonstrate that the defendant conducts activities of which
 4    one of his proposed prospective custodians, if you will, is
 5    unaware.
 6              THE COURT:  I'm sorry.  One of his proposed
 7    custodians is unaware?
 8              MR. BHACHU:  The notion is -- what we're trying to
 9    demonstrate is that the defendant has engaged in a range of
10    conduct before his arrest that his family is simply unaware of
11    and did not detect.  That's for purposes of demonstrating that
12    if the defendant is released, there's very substantial concern
13    that that type of conduct will continue.
14              THE COURT:  Okay.  I'll allow it.
15    BY THE WITNESS:
16    A.  Could you repeat the question?
17    BY MR. BHACHU:
18    Q.  Yes, sir.  Have you ever been aware of your husband during
19    the course of your marriage being unfaithful?
20    A.  No.
21    Q.  So to your knowledge, as far as you know, he's been
22    completely monogamous?
23    A.  That is my understanding and my knowledge, yes.
24    Q.  You don't have an open marriage or anything like that, do
25    you, sir?
```

```
 1   A.  I don't know the definition of that.
 2   Q.  An open marriage would be one where it's permissible for
 3   one partner to engage in relations with somebody outside the
 4   course of the marriage.
 5   A.  We do not have an open marriage, that's correct.
 6   Q.  To your knowledge.
 7   A.  We do not have an open marriage.
 8   Q.  Okay.  As you understand it, correct?
 9           MR. BEDI:  Judge, objection, asked and answered.
10           THE COURT:  Yes, it was asked and answered.
11           MR. BHACHU:  Okay.
12   BY MR. BHACHU:
13   Q.  Sir, have you had occasion to review any of the texts, et
14   cetera, that were shown to you by the FBI during the course of
15   the search of the house?  Do you recall those at all?
16   A.  I remember a lot of pieces of paper being thrown in front
17   of me.
18   Q.  Okay.  You weren't familiar with any of those
19   correspondences?  You didn't send any of those text messages,
20   did you, sir?
21   A.  Could you repeat that question?
22   Q.  The text messages that you were shown by the FBI agent
23   when your husband was searched, do you recall those?
24   A.  Like I say, I recall a lot of pieces of paper being thrown
25   in front of me during the search.
```

**L. King - cross**

1   Q.  Okay.  Whatever was shown to you in terms of

2   communications during the course of that search, do you recall

3   sending any of those messages yourself?

4   A.  I honestly at this point don't recall any of the messages

5   that were put before me.  So I don't have a way to really say,

6   but nothing of what they showed me from my recollection was

7   familiar to me.

8   Q.  Okay.

9   A.  Is that a fair answer?

10  Q.  That is a fair answer.  Would it be fair to say you've

11  never sent any messages soliciting or asking for child

12  pornography?  Is that fair?

13  A.  I have not.

14  Q.  Do you recall or are you familiar with any messages where

15  your husband indicates that you were not familiar with his

16  activities at all as a pervert?

17  A.  I'm sorry.  I didn't understand that question.

18  Q.  Do you recall seeing any messages where your husband told

19  this individual he was corresponding with that you were not

20  aware of his conduct as it related to him seeking and

21  soliciting child pornography?

22  A.  I do not recall ever seeing a message with that content,

23  sir.

24  Q.  So it is fair to say that the entire incident here that's

25  happened in the last couple days is a complete shock to you.

**L. King - cross**

 1   Is that fair to say?

 2   A.  Yes.

 3          MR. BHACHU:  Okay.  Can I have a moment, Judge?

 4          THE COURT:  Yes.

 5     (Brief pause.)

 6   BY MR. BHACHU:

 7   Q.  One other area of inquiry that I had neglected to mention

 8   or discuss, were you visited at your house by local police in

 9   2017, sir?

10   A.  I don't recall the date but, yes, we've had a visit.

11   Q.  Can you tell the Court what happened during the course of

12   that visit?

13   A.  That was a long time ago.  I can do the best to recall,

14   but we had two local police officers come to our house and

15   inquire about an email address that neither of us recognized

16   that had shared, I believe, two images of child pornography,

17   and that was -- they seemed satisfied that we were not aware

18   of the -- of that particular email address and left.

19   Q.  After that visit, did you do anything, do anything in

20   terms of follow-up to try to make sure that if there was some

21   sort of child pornography that might have slipped through or

22   been downloaded in some fashion, did you do anything to try to

23   prevent that from happening again?

24   A.  Could you be a little more specific about "do something"?

25   Q.  Yeah.  So you got a visit from the police in 2017.

**L. King - cross**

24

1    A.   Uh-huh.

2    Q.   After that visit was over, did you take any proactive

3    measures or steps to try to prevent or ensure that there was

4    no child pornography in the household or being downloaded on

5    computers or devices inside the household?

6    A.   No, because my impression from the police was that they

7    were satisfied that it wasn't related to us.

8    Q.   Did you seek any professional help, like mental health

9    counseling for either yourself or for your husband after that

10   event?

11   A.   No.  Again, the police were satisfied that it wasn't

12   related to us, so they walked away.  That was my recollection.

13   Q.   Did you seek any legal help at all, either for yourself or

14   defendant, legal advice, attorney advice?

15   A.   Of course.  Anytime the police show up at your house, you

16   should seek legal advice to make sure that you are taking the

17   appropriate steps.

18   Q.   And did you do that in this case?

19   A.   Of course, I did.

20   Q.   Okay.  And based upon that advice, without getting into

21   the advice that you received, did you take any steps to try to

22   ensure that this type of event did not recur?

23   A.   No.  I mean, I can -- I can summarize and say that the

24   legal advice that I recall getting was that there's nothing to

25   worry about.

1  Q.  And you had indicated, I think, to law enforcement at the

2  time of the search that you still plan to go to California and

3  wish to go to California with your husband after the course of

4  the search warrant that was executed.  Is that fair to say?

5  A.  Could you say that again?

6  Q.  After the search warrant was executed, you had indicated a

7  desire to still travel to California with your husband, is

8  that right?

9  A.  Indicated to whom?

10  Q.  To the law enforcement officers.

11  A.  I don't recall saying anything to law enforcement officers

12  about my travel plans.

13  Q.  All right.  During the course of the search or thereafter,

14  you don't recall saying anything to law enforcement?

15  A.  I'm having a tough time recalling the times that I've

16  interacted with law enforcement beyond the time that they were

17  in our house for the search warrant.

18  Q.  Okay.  Let's focus on the time when they were in your

19  house.

20  A.  Okay.

21  Q.  During the course of that search, did you reference

22  anything to law enforcement about your desire to travel with

23  your husband to California?

24       MR. BEDI:  Objection, asked and answered.

25  BY THE WITNESS:

**L. King - cross**

```
1    A.  I'm having a tough time under --

2            MR. BEDI:  Objection, asked and answered.

3            MR. BHACHU:  I don't think the question was answered.

4            THE COURT:  I don't think he answered the question.

5    BY THE WITNESS:

6    A.  I don't recall a time in speaking to law enforcement

7    expressing a desire to travel or not travel to California with

8    my husband.

9            MR. BHACHU:  Okay.  No further questions, Judge.

10   Thank you.

11           THE COURT:  Thank you.

12           MR. BEDI:  Judge, I'll call --

13           THE COURT:  He may want to ask you some questions.

14           THE WITNESS:  Oh, okay.

15           THE COURT:  Go ahead, Mr. Bedi.

16           MR. BEDI:  No additional questions for Mr. King.

17           THE COURT:  Thank you.

18      (Witness excused.)

19           THE COURT:  I'll call Kirby King.

20      (Brief pause.)

21           THE CLERK:  So, sir, please raise your right hand,

22   and can you state and spell your last name for the record,

23   please?

24           THE WITNESS:  It's King, K-i-n-g.

25      (Witness duly sworn.)
```

**K. King - direct**

```
 1                KIRBY KING, DEFENDANT'S WITNESS, DULY SWORN,

 2                          DIRECT EXAMINATION

 3    BY MR. BEDI:

 4    Q.  Mr. King, how do you know Adam King?

 5    A.  I'm his father.

 6    Q.  So it's fair to say you've known him your whole -- his

 7    whole life.

 8    A.  Yes, I have.

 9    Q.  Okay.  And do you work?

10    A.  No, I'm retired now.

11    Q.  And what are you retired from?

12    A.  I was an executive at a local bank in Evansville, Indiana.

13    Q.  Are you married?

14    A.  Yes, I am.

15    Q.  And what's your wife's name?

16    A.  Tina.

17    Q.  And does she work?

18    A.  No, she's retired as well.  She was a teacher at a local

19    grade school.

20    Q.  Okay.

21    A.  Junior high, actually.

22    Q.  Since Friday morning, you and I have had a few

23    conversations about a potential release plan for Adam if the

24    Judge were to release him.  Is that fair to say?

25    A.  Yes.
```

**K. King - direct**

1  Q.  And where do you currently live?

2  A.  I live in Boonville, Indiana.

3  Q.  And you'd be willing to move into the Hughes Road home and

4  serve as a third party custodian for Adam, is that correct?

5  A.  Yes, we would.

6  Q.  And can you just share with the Court what your

7  understanding of being a third party custodian would entail?

8  A.  The three primary parts, I think, are to make sure that he

9  has no access to the Internet, to make sure that he does not

10  leave the area, leave the house, and, third, to make sure no

11  one under 18 years of age has access to him.

12  Q.  And if you were to see or learn that Adam was having or

13  had Internet access, what would you do?

14  A.  I'd contact the police and pretrial, pretrial services.

15  Q.  And if the Court ordered home incarceration or location

16  monitoring requiring him to stay in the home and he left the

17  home, what would you do?

18  A.  I would contact pretrial services and the police.

19  Q.  And what if he -- if you learned that he had any contact

20  with minors?  What would you do?

21  A.  I would, again, contact pretrial services and the police.

22  Q.  And since you and your wife are both retired, the plan

23  would be for you both to move to the Hughes Road house, is

24  that correct?

25  A.  That's correct.

**K. King - cross**

29

1   Q.  And that way there's somebody there at all times

2   monitoring Adam.

3   A.  That's correct.

4          MR. BEDI:  Thank you, Judge.  I have nothing else.

5                    CROSS-EXAMINATION

6   BY MR. STONE:

7   Q.  Good afternoon, sir.  Sir, how old is your son?

8   A.  He's 39.

9   Q.  Is it fair to say it's been awhile since he's lived under

10  your roof?

11  A.  It's been awhile, yes.

12  Q.  About 20 years?

13  A.  Probably -- for an extended period of time, probably about

14  20 years, yeah.

15  Q.  And since he graduated high school and left Boonville,

16  Indiana, he's lived in a few different places, is that

17  correct?

18  A.  That's correct.

19  Q.  He went to school at Purdue, is that right?

20  A.  Yes.

21  Q.  Did he -- where did he do his vet school?

22  A.  North Carolina State.

23  Q.  And where did he do his residency?

24  A.  In Colorado State University.

25  Q.  And during that time, did you see him frequently?

**K. King - cross**

```
 1   A.  Oh, as frequently as we could.

 2   Q.  Can you help me understand?  At holidays?

 3   A.  Well, more than just at holidays.  We would see him, I'd

 4   say, several times a year.

 5   Q.  And did you sometimes travel to go see him where he was?

 6   A.  Oh, yeah.  Yeah, we had to.

 7   Q.  And during his years as an adult, have you ever known your

 8   son to spend any time around children?

 9   A.  Time around children?

10   Q.  Yeah.  Have you ever seen him around children?

11   A.  My only exposure to that would be, you know, at the

12   Christmas holidays, probably, when he always came home and he

13   was around other family members that were children.

14   Q.  And that was generally only when he came home, is that

15   correct?

16   A.  That's correct.

17   Q.  Have you ever known your son to -- have you ever

18   discovered your son viewing pornography?

19   A.  No.

20          MR. STONE:  No further questions, Your Honor.

21          MR. BEDI:  Nothing based on that, Your Honor.

22          THE COURT:  Okay.  Thank you.

23     (Witness excused.)

24          MR. BEDI:  We would call Jake Grobe.

25     (Brief pause.)
```

**Grobe - direct**

31

```
 1              THE CLERK:  Sir, please raise your right hand, and
 2    can you spell your last name for the record?
 3              THE WITNESS:  Grobe, G-r-o-b-e.
 4       (Witness duly sworn.)
 5              JAKE GROBE, DEFENDANT'S WITNESS, DULY SWORN,
 6                        DIRECT EXAMINATION
 7    BY MR. BEDI:
 8    Q.  Good afternoon.
 9    A.  Good afternoon.
10    Q.  Do you know Adam King?
11    A.  I do.
12    Q.  And how do you know Adam King?
13    A.  Adam is my son-in-law.
14    Q.  And so you are Lucas's father.
15    A.  Yes.
16    Q.  So how long have you known Adam?
17    A.  I believe I've known Adam somewhere around ten years,
18    maybe a little over ten years.
19    Q.  All right.  And you obviously became aware that Adam was
20    arrested Friday morning?
21    A.  Yes.
22    Q.  And since then, you and I have talked about a potential
23    release plan for Adam if the Court deemed it appropriate.  Is
24    that fair?
25    A.  That is correct.
```

**Grobe - direct**

1   Q.  And you're willing to serve as essentially a third party

2   custodian really for Lucas and for the minor child, correct?

3   A.  That's correct.

4   Q.  And you would understand that if the Court grants release,

5   Adam would not be permitted to have any contact with any minor

6   children, but particularly the minor child that they're

7   getting through surrogacy.

8   A.  Yes, I understand that.

9   Q.  And you would enforce that by -- what would you do if you

10   learned Adam had contact with any minor child?

11   A.  Well, I would comply certainly with all orders of the

12   Court.  I would certainly call the police and protective

13   services and any other action the Court deemed necessary.

14   Q.  I want to back up a little bit.  Do you work?

15   A.  I do not.  I'm retired.

16   Q.  Congratulations.  Are you married?

17   A.  I am.  My wife Deborah is in the audience.

18   Q.  And does she work?

19   A.  She's retired as well.

20   Q.  Okay.  So the plan would be for Lucas and the minor child

21   to live at your home, correct?

22   A.  That's correct.

23   Q.  And since you both are retired, one of you would always be

24   in the home.  Is that fair?

25   A.  We will ensure that one of us is with Noah at all times.

**Grobe - cross**

33

1    Q.  Okay.  And just so we're clear, Noah is the minor child.

2    A.  That's correct.

3           MR. BEDI:  Judge, I don't have any other questions.

4           MR. BHACHU:  All right.  Just briefly, Judge.

5                        CROSS-EXAMINATION

6    BY MR. BHACHU:

7    Q.  Good afternoon, sir.

8    A.  Good afternoon.

9    Q.  Sir, you were in the audience as we were questioning

10   Mr. King's husband.  I take it you heard my questions?

11   A.  When you were questioning Kirby King?  Yes.

12   Q.  As well as when Lucas was being questioned as well?

13   A.  Yes.

14   Q.  Okay.  So I don't want to belabor the questions that I

15   asked before, but I just want to ask some questions of a

16   similar nature.

17   A.  Sure.

18   Q.  You're retired now, having worked at the Nuclear

19   Regulatory Commission as I understand it, is that right?

20   A.  I have a career over 40 years in nuclear safety.

21   Q.  And you also worked at Exelon as well?

22   A.  Exelon Nuclear Generation, that's correct.  It's now

23   called Constellation Energy.

24   Q.  I've heard of that company before.

25           Sir, with regards to the allegations that have been

```
 1   made in the complaint, have you had occasion to read that
 2   complaint?
 3   A.  I did not read the complaint, no.
 4   Q.  Generally speaking, you're aware of the allegations that
 5   have been made by the Government, correct?
 6   A.  That is correct.
 7   Q.  I'm not asking you to opine on whether or not they're true
 8   or not, but what I'm asking you is this.  Did you have any
 9   hint or idea over the course of the ten years that you've
10   known your son-in-law that he may have been engaging in that
11   kind of conduct?
12   A.  I have seen no evidence of that, and I was not aware of
13   anything of that nature.
14   Q.  So this comes as a complete surprise to you, it's fair to
15   say, is that right?
16   A.  Absolutely.
17   Q.  And with regards to the trip to New York, did you hear me
18   asking questions about that trip to New York?
19   A.  I did.
20   Q.  Okay.  Were you familiar with the fact that the two, Lucas
21   and Adam, had traveled to New York in 2019 -- sorry -- in
22   January of this year?
23   A.  I was aware of that, yes.
24   Q.  Okay.  And do you know what the purpose of that trip was?
25   A.  It was a trip to visit the city and see some Broadway
```

 1  shows and visit with friends.

 2  Q.  And you had no idea --

 3  A.  I'm sorry.  I couldn't hear that question.

 4  Q.  Well, let me start over.  That's okay.

 5        You didn't have any idea of any sort of contacts over

 6  any Telegram application or anything like that by Adam with

 7  individuals that were interested in exchanging or discussing

 8  child pornography.  You weren't aware of that at all, were

 9  you, sir?

10  A.  Prior to this week, I'd never heard of Telegram, and I

11  have not been aware of Adam having any conversations

12  whatsoever through any medium about child pornography.

13  Q.  Now I know you are educated in the area of nuclear power.

14  A.  Yes, sir.

15  Q.  That's a pretty complicated area, I'm given to understand.

16  It's fair to say you're not as educated in the area of social

17  media applications that might be used by younger folks to

18  communicate?

19  A.  Now be nice.  I'm familiar with social media applications

20  that typical people use, Facebook and Twitter and things of

21  that nature.

22  Q.  Okay.  But you had not heard of Telegram before.

23  A.  No, I had not heard of Telegram.

24  Q.  Scruff, have you heard of that application before?

25  A.  No.

**Grobe - cross**

36

1   Q.  Have you heard of an application called Mega before?

2   A.  No, I don't believe.

3         MR. BHACHU:  Okay.  No further questions.  Thank you,

4  Judge.

5         THE COURT:  Okay.  Thank you, Mr. Grobe.

6         MR. BEDI:  Nothing based on that, Your Honor.

7         THE COURT:  Okay.  You may step down.

8   (Witness excused.)

9         THE COURT:  Okay.  Do you want to address any

10  argument now that you've put the witnesses on?

11         MR. BEDI:  I do, Your Honor.  Your Honor, I'd ask

12  that you grant Adam's release.  He's not a flight risk, and I

13  think the Government is not even arguing that he is.  I'd like

14  to point out that since the search warrant on March 5th, he

15  stayed in the area.  He didn't flee.  He didn't make any plans

16  to.  There's no allegation that he would be a flight risk.

17  He's willing to turn in his passport.  We have that here today

18  that we could turn in to Your Honor right now.

19         There are conditions that would reasonably assure the

20  safety of the community in addition to what we laid out in our

21  motion, which is Lucas will move out of the house, which he

22  has already done, live with his parents, and Adam's parents,

23  Kirby and Tina, who you heard from today, will move in and act

24  as third party custodians.  He'll have no contact with any

25  minors under the age of 18.  The Internet at the house will be

1   disabled, and he'll be prohibited from accessing any Internet
2   devices.
3           Any other conditions Your Honor puts in place in
4   addition to what we proposed, oral or written, I've also
5   orally proposed that if location monitoring is some concern,
6   location monitoring would be appropriate or home incarceration
7   with limited travel.
8           Your Honor, these are essentially two strong third
9   party custodians.  In fact, not to play on the words, but the
10  third party custodian here has a third party custodian, and
11  that is a strong proposal that would eliminate any
12  conditions -- any concern about the safety of the community.
13          3142(g) obviously gives Your Honor some guidance on
14  this, and we don't need to go through what the exact law is.
15  I know Your Honor read it.  The Government has focused their
16  argument completely on the nature and circumstances of the
17  offense, which the Government always does, but it says that
18  you need to look at the offense as charged.
19          The uncharged chats, as they were, are salacious.  I
20  think everybody would agree with that.  They're salacious, but
21  they are just that.  They're chats.  This allegation about the
22  Benadryl and the nieces and nephews, what the Government
23  failed to inform the Court of is that FBI agents have scanned
24  the country and interviewed people who would call Adam "uncle"
25  and who would be nieces and nephews of Adam, interviewed them

1   all, and there is not one person that corroborates that that

2   occurred.

3           That is a significant, I think, factor that Your

4   Honor needs to consider.  There's no corroboration of any

5   assault.  These chats, I'm not or we're not even a little bit

6   agreeing that this was Adam, but these chats are just that.

7   They're just chats, and there is nothing to corroborate it.

8           THE COURT:  He does have a niece and nephew outside

9   of the country, though, according to the pretrial services

10  report, and they are minor children that he did visit outside

11  of the country, isn't that correct?

12          MR. BEDI:  I do not believe he's visited them outside

13  the country.

14          THE COURT:  In Switzerland?  It's on page 2.  He

15  stated that his husband has a minor-aged niece, approximately

16  10 or 11 years old, and a minor-aged nephew, approximately

17  five or six years old, who reside in Switzerland, and they had

18  contact with them in 2013 and 2016.

19          MR. BEDI:  Judge, I think that's a mistake.  It's

20  not -- I don't believe that he had any contact with them in

21  2016.

22          MS. TRAMONTE:  Your Honor, pretrial services.  It's

23  my understanding he reported travel for the wedding of his

24  brother in 2013, and I understand that they traveled here to

25  attend his wedding in 2016.

1          THE COURT:  With the children.

2          MS. TRAMONTE:  That's my understanding.

3          MR. BEDI:  And, Judge, it's my understanding that

4   he's only had any -- only met the niece once at a family

5   function.  So the 2016 Switzerland travel, my understanding is

6   that she was -- the wife was pregnant with her first child at

7   that point.  So I understand Your Honor's point, but I think

8   it still is consistent that there is nothing to corroborate

9   that in that the Government has interviewed numerous people

10  and has not substantiated any of that allegation.

11         Your Honor, there is -- one of the factors you have

12  to look at is the personal history and characteristics.  Adam

13  is 39 years old.  He's lived in the Northern District of

14  Illinois, and until -- he's never been arrested until Friday.

15  Up until yesterday, he was working as a veterinarian.  He's

16  very well educated.  He has a degree from Purdue.  He's board

17  certified in numerous states.

18         His personal history and characteristics other than

19  this, other than this, the character letters that we've

20  provided show that he has unimpeached character.  The physical

21  and mental condition, there's nothing about that that would

22  warrant detention.  He has strong family ties, I think as you

23  heard today, not just from his family but from his in-laws who

24  are here today.  I'm not sure how many people in this

25  courtroom could have their in-laws come and be as supportive

1   as his in-laws were.  I'm not sure my in-laws would, but I

2   think that shows how supportive his family is.

3          The financial resources, I know that pretrial has

4   some concern about that.  If there is concern, they're willing

5   to -- the family is willing to post a significant bond to

6   ensure that he complies with all Your Honor's conditions.  He

7   has extensive community ties, no history of drug or alcohol

8   abuse, no criminal history.

9          For all those reasons, everything we've laid out in

10  the motion, he's not a flight risk and there are clearly

11  conditions that Your Honor could put in place to reasonably

12  assure the safety of the community:  no Internet access, no

13  contact with any Internet-capable device, location monitoring,

14  surrendering a passport, no contact whatsoever with minors.

15         Again, Your Honor, as I said and I won't belabor the

16  point, the third party has a third party.  How often do we see

17  that here?  We are proposing three strong third party

18  custodians, and I'd ask that you grant our motion with

19  extensive conditions.

20         THE COURT:  Thank you.

21         Does the Government have anything further?

22         MR. STONE:  Yes, Your Honor, and I'll try to keep my

23  points brief.  So a couple points.  First, it's not true that

24  the Court should just consider the offense charged.  The

25  nature and circumstances of the offense charged is one factor

1   that the Court may consider of the 3142(g) factors.  The Court

2   should also consider the nature and seriousness of the danger

3   to any person in the community, and that's why we are having a

4   hearing here today, Your Honor, to consider evidence, not just

5   the offense charged.

6         Second, Your Honor, I think from what we're seeing

7   here it's clear to the Court or it should be clear to the

8   Court that the defendant is living a double life.  He's got

9   tons of people in his corner who know nothing about this side

10  of him.  It's got to be horrible to go through that, but that

11  doesn't change the facts, Your Honor, and the facts are that

12  the defendant, he sent these chats.  He sent the child

13  pornography.  He made these horrific statements about his

14  child that he was going to retrieve from California with his

15  husband.

16        I want to say about the nieces of nephews, proving a

17  negative is a very difficult thing.  First of all, if the

18  child was four years old at the time, that child can't have --

19  almost certainly couldn't have reported the abuse, especially

20  as described by the defendant and how he did it.

21        Second, the defendant is 39 years old.  This could

22  have happened 15 years ago with somebody he sort of saw as a

23  niece and nephew in any of the places he has lived.  Your

24  Honor, it's no surprise that the FBI is having trouble

25  tracking these people down because the defendant is very good

1    at hiding what he does.  He's very manipulative.  He's

2    extremely good at compartmentalizing his life and hiding this

3    side from people who love him.

4          Finally, Your Honor, I just want to address the

5    Monfre case that Your Honor asked about.  I did not have time

6    to read the case.  However, I will point out that it's a 2009

7    case.  Nowadays, Your Honor, the Internet is ubiquitous.  It's

8    everywhere.  Wi-Fi is readily accessible, and it's free.  You

9    can go to a public park and find it or to a Starbucks.  That

10   wasn't the case in 2009.  IPhones had just been out a year and

11   a half maybe, so we're talking about a totally different

12   environment today than existed when the Monfre case was

13   decided.

14         So for all the reasons we've discussed, Your Honor --

15   oh, finally, Your Honor, it appears that I saw this in defense

16   counsel's filing.  The defendant is apparently attending

17   Sexual Compulsives -- oh, this is Monfre.  Oh, that's right.

18   So in the Monfre case, the defendant there was attending

19   Sexual Compulsives Anonymous treatment.  We don't have any

20   awareness of that happening here, Your Honor.

21         So for the reasons that we've discussed, the

22   Government believes that detention is the only remedy here

23   that will assure the defendant's appearance here in court and

24   the safety of the community.

25         THE COURT:  I'd like to just talk with my law clerk

1   very briefly off the record.  So we're going to take like less

2   than a five-minute break, and then I'll be back.  Okay?

3           MR. STONE:  Thank you.

4           MR. BEDI:  Thank you.

5     (Recess.)

6           THE COURT:  Okay.  I mean, this is obviously not your

7   run of the mill detention hearing.  There's usually not

8   obviously so many family members present.  It's a very

9   serious, serious charge that the defendant is facing, and as

10  everybody has indicated during this hearing, this is a charge

11  that comes with a -- it's a rebuttable presumption of

12  detention in this case, and that's under 18 3142(e)(3)(E)

13  based on the type of offense that is charged here, which is an

14  offense involving a minor.  It's very serious.

15          As we went through, the Court must consider certain

16  factors, one being the nature and circumstances of the offense

17  charged, two, the weight of the evidence against the person,

18  three, the history and characteristics of the person and,

19  four, the nature and seriousness of the danger to any person

20  or the community that would be posed by the person's release.

21  That's under 18 U.S.C. 3142(g).

22          I do think here that the defendant may arguably have

23  rebutted the presumption as to risk of flight.  I think based

24  on the proposed conditions that they go through, you know,

25  obviously giving up his passport, having third party

1  custodians, maybe putting him on some type of location

2  monitoring, all of those things do go to, I believe, rebutting

3  a presumption as to the risk of flight.

4          But what the Court does not find that these things

5  do, at least not to this Court's eye, is I do not believe that

6  the defendant has done so as to the danger that he poses to

7  the most vulnerable, which are minor children in the community

8  if he is released.  I think that there are circumstances.  The

9  nature and circumstances of the offense charged, as the

10  Government has referenced, is abhorrent.

11          I do believe -- I'm very familiar, obviously, with

12  what's contained in this complaint.  I am the judge that

13  signed the complaint.  I'm the judge that signed the arrest

14  warrant in this case, and that is because I found the

15  evidence, which I'm allowed to consider the weight of the

16  evidence against the defendant, Mr. King, to be substantial.

17  It was not a difficult call for me in terms of signing that

18  complaint because there is substantial evidence.

19          One other item that I find very interesting is that

20  when the FBI did come to the home on its search warrant

21  earlier in March that the defendant -- and this is something

22  that came up in his initial appearance but not today -- that

23  the defendant was actually deleting items from his iPhone.  He

24  was destroying evidence while the search warrant was being

25  served.

1          I find that there are a lot of issues related to
2    what's contained in that complaint.  I will go through a few
3    of them that to me show that the nature and circumstances of
4    the offenses charged are extraordinarily serious and in terms
5    of the danger to any person, as I said, which would be minors
6    in the community, that will be posed by his release.

7          For example, as we've heard, there are information
8    related to chats that concern that the defendant had engaged
9    in sexual acts with a four-year-old.  That's contained in the
10   complaint.  There is information contained in the complaint
11   that he had actually drugged with Benadryl nieces and nephews,
12   as we've heard in court today.  That is contained in the
13   complaint.

14         But to me potentially, not that those aren't all
15   very, very disturbing, there's also the fact that he
16   communicated with people that he had an extensive collection
17   of child pornography as well as some personal videos that he
18   had saved to his Telegram secret chats.  As we know, the
19   Telegram app is the application that the defendant was
20   actually deleting at the time the warrant was being served at
21   his home.

22         But to me, one of the most disturbing in the nature
23   of circumstances of this case is obviously what the defendant
24   is alleged to have written about his plans to intentionally
25   sexually abuse his unborn child that was due to be born in the

1   next few days.  I believe that he and his husband were

2   planning to travel to California tomorrow to be with the

3   surrogate for the birth of the child, and the defendant in the

4   complaint, it is alleged he discussed his plans to invite a

5   friend over to abuse the child, and twice mentioned this,

6   noting on November 9th, 2023, that they're born to suck, ha,

7   ha, and stating, quote:

8           "I plan on getting my cock in him ASAP."

9           On December 29th, 2023, the defendant sent a

10  photograph of a baby's outfit he claimed to have received as a

11  gift for Christmas.  Defendant -- on January 19th, 2024,

12  defendant again wrote about the baby that was soon to be

13  arriving:

14          "The crib is being delivered this weekend."

15          The defendant also sent ultrasound photographs to the

16  person in New York that he claimed to be of his unborn child,

17  and I do believe the complaint indicates that when the FBI

18  executed its search warrant that they spoke with his husband

19  and that he did confirm that those were, in fact, ultrasound

20  photographs from their unborn child that he had been sending

21  through these chats.  They also discovered during the search

22  of the home the actual baby onesie that he had sent through

23  the chat pictures.  The FBI was able to recover that.

24          So for all of those reasons, the nature and

25  circumstances in these chats, these specific references to

1   prior potential molestation of minors and also future intended

2   molestation of minors is very concerning to the Court, to say

3   the least.

4          So I also want to go through, obviously, a couple of

5   reasons in the caselaw that I think that my decision is

6   supported; that is, I think that an important case to look at

7   and to refer to is a very recent case here in the Northern

8   District of Illinois, and that case is United States versus

9   Grooms.  It's 2022 Westlaw 1204861.

10          In that case, it goes through, again, a long list of

11  a lot of things very similar to this defendant.  That

12  defendant in that case had no criminal history, had strong

13  ties to the community, had family support, had no pattern of

14  past non-appearances because they'd never been involved with

15  the law.  Obviously in terms of flight, again, that was

16  sufficient in that case to rebut the presumption as to

17  appearance, but again, just as I am finding, in Grooms they

18  found that the defendant had not rebutted the presumption with

19  evidence concerning the enormous danger to the community that

20  he poses if he is released.

21          As to the issue as to the Internet and Internet

22  access and why it is different today than it was back in 2009,

23  again, the Grooms case is instructive on that point.  If we

24  look at it, this is at star page 4:

25          "Imposing conditions of release such as no use of

1   Internet or Internet-capable devices certainly has some

2   appeal, but they are in reality notoriously difficult to

3   enforce.  Pretrial services has absolutely no ability to

4   monitor this condition."

5           Access to the Internet is also extremely easy, as we

6   all know now and as the Government had mentioned just before

7   we finished up the hearing.  Most TV's are Internet-capable,

8   and free Wi-Fi is often available from areas surrounding a

9   home even if a home's Internet subscription is discontinued.

10          So I have real concerns, as did this exact court, the

11  Northern District of Illinois in the Grooms case, as to the

12  ability to actually ensure that the defendant, Mr. King, is

13  unable to access the Internet.  I think it's so ubiquitous

14  that that's almost impossible, unfortunately, and here that is

15  the real issue.

16          As I said, I do believe he would appear in court, but

17  I do not believe that I could impose any conditions that would

18  actually assure the community and its most vulnerable people

19  that it will not be harmed.  He's a serious danger to children

20  is this Court's belief, and I don't believe that the

21  conditions that have been proposed by defendant address that.

22          As to distinguishing the case that the defendants

23  have provided to me, United States versus Monfre that's at

24  2009 Westlaw 2031829, I think this case is distinguishable for

25  a number of reasons.  One, the chats that the court reviewed

1  in that case were found to be inconsistent.  Here,

2  unfortunately, all of the chats which were included in the

3  exhibits that the Government provided, some of which I've

4  related but there's more information than what I've related

5  here in issuing my ruling, are completely consistent,

6  unfortunately, with someone who obviously is a pedophile and

7  talks about pedophilia, seeks to share this information, share

8  pedophilia with another person, as well as is, unfortunately,

9  very consistent communications about personal involvement with

10  minors.

11       So I find the case distinguishable on that basis, and

12  another basis is that the defendant in that case, in the

13  Monfre case, had been attending Sexual Compulsives Anonymous

14  support group meetings for 14 months prior to the arrest.  So

15  it was not something that came up at the time of the arrest.

16  They had already been in treatment.  That's different than we

17  have here.

18       I do believe as we've heard, unfortunately, from all

19  the family members here, this was a complete shock.  Nobody

20  knew that this was going on.  But, unfortunately, the weight

21  of the evidence is quite strong here, and it does appear that

22  this activity has been going on, at least from what this Court

23  has seen, since last year in 2023.  It may be earlier based

24  upon this new information related to the Aurora police visit

25  in 2017, but at least since 2023 where I've seen the chat

1    messages dating back that far.

2            A third way that I think this case is distinguishable

3    is that the Probation Department recommended release with

4    conditions in this case.  Here, I think it's very important to

5    note that pretrial services recommended detention.  They did

6    that without the ability to consider the weight of the

7    evidence, as this Court must.  They still recommended that

8    this defendant be detained and that there were no conditions

9    to assure that the community would be protected, and it said

10   there were no conditions that would reasonably assure his

11   appearance.

12           So for all of those reasons, the Court is going to

13   detain defendant King during this case.  I would like to write

14   up something just because there were so many cases that I

15   referenced, so I'll probably write up a short memorandum

16   opinion and order following this.  You know, I'll have a short

17   minute order we'll enter today, but then I will follow up with

18   a written order as well.  Okay?  Okay.

19           Is there anything further from the Government at this

20   time?

21           MR. STONE:  No, nothing from the Government, Your

22   Honor.

23           THE COURT:  Okay.  Anything from the defense?

24           MR. BEDI:  Yes, Judge.  We did file an unopposed

25   motion for early return of the subpoenas.

```
 1              THE COURT:  Okay.  All right.  So I haven't seen
 2   that, but it's an unopposed motion so I will assume I will
 3   grant the motion.
 4              MR. BEDI:  Thank you, Judge.  Judge, I believe we
 5   need to set a preliminary hearing because we are not waiving
 6   it.
 7              THE COURT:  Okay.  I don't know if we have a date,
 8   Rosa.
 9              THE CLERK:  Do you have a date in mind, counsel?
10              MR. BEDI:  We're already within the timeframe.
11              MR. STONE:  The Government would ask for next
12   Thursday, if the Court can accommodate that.
13              THE COURT:  No.
14              MR. STONE:  No?
15              THE CLERK:  The Court is unavailable next week.
16              THE COURT:  Yes, sorry.
17              MR. STONE:  The Court is not available next week, you
18   said?
19              THE CLERK:  Except for Monday.
20              THE COURT:  Yes.
21              MR. BEDI:  Judge, we could do Monday.  If we can do
22   it in the afternoon, that's agreeable.
23              THE COURT:  Monday, the 1st?
24              MR. BEDI:  Yes, Judge.
25              THE CLERK:  Is that acceptable?
```

```
 1              THE COURT:  They're nodding.

 2              MR. STONE:  Yes.

 3              MR. BHACHU:  That's good.

 4              THE COURT:  All right.  So Monday, the 1st.

 5              MR. BEDI:  What's the time?

 6              THE CLERK:  1:30.

 7              MR. BEDI:  Thank you, Judge.

 8              THE COURT:  We won't be in here, though, right, Rosa?

 9   We'll be in my courtroom, which is Courtroom 1700 down at the

10   end of the hallway.

11              THE CLERK:  Right.

12              MR. STONE:  One other matter, Your Honor.

13              THE COURT:  Yes.

14              MR. STONE:  The Government will be moving for a

15   protective order.  I've already shared it with defense

16   counsel.  We'll be moving for a protective order for discovery

17   in the case.

18              THE COURT:  Okay.  All right.  Is there anything

19   else?

20              MR. BEDI:  No, Judge.  I've reviewed that, and I have

21   no objections to what was proposed.

22              THE COURT:  Okay.  All right.  Well, thank you all,

23   and we'll see you again on Monday.

24     (Proceedings concluded.)

25
```

53

```
 1                         C E R T I F I C A T E

 2            I, Patrick J. Mullen, do hereby certify the foregoing

 3    is an accurate transcript produced from an audio recording of

 4    the proceedings had in the above-entitled case before the

 5    Honorable KERI L. HOLLEB HOTALING, one of the magistrate

 6    judges of said court, at Chicago, Illinois, on March 26, 2024.

 7

 8                                    /s/ Patrick J. Mullen
                                      Official Court Reporter
 9                                    United States District Court
                                      Northern District of Illinois
10                                    Eastern Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```