# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | 24 CR 153 |
| ADAM KING, | |
| Defendant | |

## DEFENDANT'S MOTION FOR REVOCATION OR AMENDMENT OF DETENTION ORDER

Adam King, by and through his attorney Bedi & Singer, LLP, respectfully requests this Honorable Court revoke the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b) and release Dr. King with appropriate conditions pursuant to the Bail Reform Act (BRA). In support of his motion, Dr. King submits the following:

TABLE OF CONTENTS

I.    **FACTS** ..........................................................................................................1

    A.  Dr. King's history and characteristics shows that he is not a flight risk or danger to the community...……………………………….............................. 1

    B.  The government moved to detain Dr. King at his initial appearance............. 3

        1.  The government charged Dr. King and moved for his detention .......3

        2.  Dr. King filed an extensive motion supporting his release................. 3

        3.  The government filed a response that relied almost exclusively on its own allegations ...................................................................................4

    C.  Dr. King showed that he is not a flight risk or danger to the community during his detention hearing  ........................................................................5

        1.  The government's oral arguments mirrored its written response.......5

        2.  Dr. King presented three strong third-party custodians ....................6

        3.  Defense counsel showed there are conditions of release that can assure community safety..........................................................................8

        4.  The government responded with unspecified and unreasoned concerns ............................................................................................ 9

    D.  The magistrate judge found no conditions of release could reasonably assure community safety in Dr. King's case  ...............................................11

II.    <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>.................................... 11

    A.  Dr. King rebutted the presumption of detention based on his family support, education, employment, community ties, lack of criminal history, third-party custodians, low-risk status, and proposed conditions of release ...................................................................................................................11

    B.  There are conditions of release that will reasonably assure community safety in Dr. King's case  ................................................................. 12

C.  The government has failed to carry its burden to show there are *no* conditions of release that could reasonably assure the safety of the community.......................................................................................................14

    1.  The government failed to explain how all of the release conditions available to the court are insufficient to reasonably assure community safety ...................................................................................15

    2.  Ironclad guarantees are not required to release Dr. King ................17

    3.  The government's cited cases do not support Dr. King's detention..19

D.  The magistrate judge erred when it found that no conditions of release could reasonably assure community safety. ...................................................20

    1.  The magistrate judge erred by relying on the government's misleading and inapplicable cases .......................................................23

    2.  Other district courts have released similarly situated defendants with more serious charges .....................................................................23

    3.  The magistrate court gave too much weight to uncharged, uncorroborated, and untrue conduct..................................................25

    4.  The magistrate judge erred when she found that none of the conditions would prevent future deception.........................................26

    5.  The magistrate judge's unspecified and unreasoned concern regarding wifi does not justify detention .............................................26

    6.  Dr. King is willing and able to engage in any appropriate treatment........................................................................................27

E.  The defense's proposed conditions of release for Dr. King...........................27

## I. FACTS

Dr. King has shown for nearly four decades that he is not a flight risk or danger to the community. So when the government charged Dr. King and moved for his detention pending trial, Dr. King presented substantial evidence, both in his motion and at his detention hearing, of his outstanding history and character. He also presented strong third-party custodians and proposed certain conditions to show that there are conditions of release the court can impose to reasonably assure community safety. The government thus failed to carry its burden by clear and convincing evidence that no conditions of release will assure community safety, but the magistrate judge still ordered that Dr. King be detained pending trial. Dr. King now moves for this Court to revoke the magistrate judge's order and release him with appropriate conditions.

### A. Dr. King's history and characteristics shows that he is not a flight risk or danger to the community

Dr. King is thirty-nine years old with no criminal history. He was born in Evansville, Indiana, as the only child to Kirby and Tina King. PSR at 1. Dr. King was raised in Booneville, Indiana, and eventually settled in Chicago for work.

Dr. King is well educated. He received his Bachelor of Science degree from Purdue University in Animal Science. *Id.* at 3. Dr. King then continued his education, earning his Doctor of Veterinary Medicine degree at North Carolina State University's College of Veterinary Medicine. *Id.* He completed his specialty residency as a Veterinary Ophthalmologist at Colorado State University located in Ft. Collins, Colorado. *Id.* Dr. King is now a board-certified veterinarian ophthalmologist. He is licensed in several states, including but not limited to Illinois, Indiana, Ohio, Michigan, Wisconsin, North

Carolina, Florida, Rhode Island, and Oklahoma. *Id.*

Dr. King moved to the Chicagoland area around 2015 and worked in the Chicago suburbs from 2015 to 2019. Most recently, he was employed at MedVet Chicago. *Id.* He is the ophthalmology specialty leader for all MedVet locations, but he does not have to travel for work.

Dr. King is the sole breadwinner for his family, as his husband, Lucas, does not work outside of the home. Dr. King and Lucas married in 2016. Tran. at 12. They moved to Elburn, Illinois and lived in their home, with their nine dogs, for around seven years. PSR at 1. Dr. King and Lucas also own property in Batavia, Illinois which they bought around 2020. There are no weapons of any kind in either home or owned by the couple. No one else lived in the houses with them.

In addition to Lucas, Dr. King has strong ties to the area. Dr. King's parents, Kirby and Tina, still reside in Boonville, Indiana. Lucas' parents, Jake and Deborah Grobe, also live approximately thirty minutes away from their home in Elburn. Dr. King and Lucas are incredibly close to both sets of parents and speak to them daily. Dr. King and Lucas' parents are extremely supportive and will assist them in any way they can.

Dr. King has no physical or mental health conditions, nor does he have any addiction issues. *Id.* at 4-5. Recently, Dr. King was evaluated by a forensic psychologist. In an oral report to the undersigned counsel, the forensic psychologist found that "Adam is low risk for sexually victimizing people." Dr. King has no criminal history, no prior arrests, and no failures to appear.

Dr. King's history and characteristics, including his family support, education,

2

employment, community ties, lack of criminal history, and low risk status show that he is not a flight risk or danger to the community.

## B. The government moved to detain Dr. King at his initial appearance

On March 5, 2024, federal agents executed a search warrant at Dr. King's home. Dr. King did not flee. Long before the search warrant was executed and the investigation turned overt, Dr. King and Lucas bought plane tickets to travel to Sacramento, California on March 25, 2024, to welcome their son, who was delivered via surrogate. The couple of course planned to return to the Chicagoland area.[1]

### 1. The government charged Dr. King and moved for his detention

On March 21, 2024, the government charged Dr. King by criminal complaint with one count of distributing child pornography, in violation of 18 U.S.C. 2252A(a)(2)(A). Dkt. 1. Dr. King was arrested at 6:00 am, the next morning, on March 22, 2024. At Dr. King's initial appearance, the government orally motioned for Dr. King's detention pending trial. The court set Dr. King's detention hearing for March 26, 2024. Dkt. 6.

### 2. Dr. King filed an extensive motion supporting his release

On March 25, 2024, Dr. King filed a motion supporting his release. Dkt. 10. In his motion, Dr. King recounted his longstanding, law-abiding background, which he showed rebutted the slight presumption of detention. *Id.* at 1-2, 6-7. Dr. King also explained how the presumption of detention results in unnecessary detention of low-risks defendants like himself, citing a study from the Administrative Office of the Courts—the central support entity that serves the federal Judiciary in carrying out its constitutional mission

---

[1] The only reason there was no return flight was because their child could not fly home until he was seven-days-old, and they did not know when they should book the return flight. However, evidence in the complaint supports the defense position that they were returning to the Chicago area with the newborn child.

to provide equal justice under law. *Id.* at 4-6. Dr. King further proposed conditions of release that would ensure his return to court and community safety, but ultimately requested release with whatever conditions the court deemed necessary. *Id.* at 7-9, 11. Finally, in support of his release, Dr. King pointed to the case of *United States v. Monfre*, No. 09-CR-30075, 2009 WL 2031829, at *1 (S.D. Ill. July 10, 2009). *Id.* at 9-11.

### 3. The government filed a response that relied almost exclusively on its own allegations

The government filed a response to Dr. King's motion on March 26, 2024. Dkt. 14. In support of detention, the government relied almost exclusively on its own accusations. *Id.* The government argued that Dr. King did not rebut the presumption of detention with his positive history and characteristics and provided a misleading block quote from *Hollerich* and an inapplicable parenthetical from *Grooms* as support. *Id.* at 9. The government wrongly argued that Dr. King only attempted to rebut the presumption with his third-party custodians, but failed to explain why the proposed custodians did not rebut the presumption or ensure community safety. *Id.* at 10.

Rather, the government attempted to shift its burden onto Dr. King, arguing "[t]he Court should reject the defendant's proposed conditions of release." *Id.* at 10. The government completely ignored its burden of showing by clear and convincing evidence that *no* conditions of release will reasonably assure community safety, and instead argued Dr. King's proposal was "not a serious recommendation." *Id.* The government took issue with Dr. King's proposal not including home incarceration, a curfew, and no domestic travel, but never explained how these conditions would be insufficient to protect the community. *Id.*

4

Finally, the government argued that the factors under § 3142(g) called for detention, again relying almost exclusively on its own accusations and failed to explain how all of the conditions available to the court would be insufficient to reasonably assure community safety. *Id.* at 11.

### C. Dr. King showed that he is not a flight risk or danger to the community during his detention hearing

Dr. King's detention hearing was held on March 26, 2024, before Magistrate Judge Holleb Hotaling. Tran. at 1. The court first asked to hear arguments from the government. Dr. King's counsel notified the court that he wished to put on three witnesses in support of Dr. King's release. *Id.* at 4. The court said it would still hear from the government first. *Id.* at 5.

#### 1. The government's oral arguments mirrored its written response

The government's arguments at the detention hearing mirrored its written motion. First, the government argued that Dr. King did not rebut the presumption with his history and characteristics because "most of those already existed when the defendant was committing this offense, so they really do nothing to rebut the presumption," seemingly relying on *Hollerich. Id.* at 6. As for Dr. King's third-party custodians, the government argued that his "parents can't really monitor his Internet access," but gave no further explanation as to why. *Id.* The government instead argued, "I understand that they've said they'll cut the Internet at the house. As Your Honor knows, there are many, many different ways to access the Internet aside from your house." *Id.* The government did not explain even one of those "many, many" ways.

5

The government also argued, "defense counsel doesn't even impose any real restrictions on his daily activities. There's no curfew. There's no confinement." *Id.* at 7. Like in its motion, the government suggested that Dr. King needed to propose certain conditions to maintain his freedom, as opposed to the government's actual burden of showing no conditions of release will reasonably protect the public.

The government next argued that the § 3142(g) factors favored detention, again, based almost exclusively on its allegations against Dr. King. *Id.* a7. Finally, the government highlighted the content of online chats that are uncharged, unsupported, and frankly untrue. *Id.*

### 2. Dr. King presented three strong third-party custodians

The court then turned to the defense, who presented three witnesses in support of Dr. King's release: (1) Lucas King, Dr. King's husband; (2) Kirby King, Dr. King's father; and (3) Jake Grobe, Dr. King's father-in-law.

Lucas first testified that he and his son moved out of the couples' shared home and into his parents' home. *Id.* at 12-13. Lucas testified that he knew Dr. King could not have contact with any minor, including their son. *Id.* at 13. Lucas testified that he would contact Pretrial Services and the police if Dr. King violated any condition, meaning Dr. King would be taken into custody. *Id.* Lucas explained that he is a mandated reporter in Illinois, and the "safety of our child is 100 percent my highest priority." *Id.* at 13-14.

Lucas further testified the home's internet was in his name, he would cut the internet at their home, and there were no internet-capable devices in the home. *Id.* at 14. Lucas confirmed that if he learned there were internet capable-devices in the home, he

6

would immediately call Pretrial and the police. *Id.* Lucas also testified that he managed the couples' finances, and he was willing to keep any credit cards, debit cards, and checkbooks away from Dr. King. Lucas testified that he would put an alert on his phone to notify him if any travel tickets or service were purchased by Dr. King. *Id.* Finally, Lucas confirmed he understood the severity of the charges, and he would immediately report any violations. *Id.* at 15.

On cross-examine, the government did not rebut any of Lucas' testimony, but instead elicited information that Lucas and Dr. King previously traveled to New York, Lucas was surprised by the government's allegations, and Lucas did not participate in any of the alleged criminal activity. *Id.* at 15-26.

Defense counsel next called Kirby King, Dr. King's father. *Id.* at 26-27. Kirby testified that he is a retired executive at a bank, and his wife, Tina, is a retired teacher. *Id.* at 27. Kirby stated that if Dr. King was released, they would move into his son's Elburn home and act as his full-time third-party custodian. Kirby understood that as Dr. King's third-party custodian, he would "make sure that [Dr. King] has no access to the Internet, to make sure that he does not leave the area, leave the house, and, third, to make sure no one under 18 years of age has access to him." *Id.* at 28. Kirby testified he would immediately call Pretrial and the police if Dr. King violated any of these conditions. *Id.*

On cross-examination, the government did not rebut any of Kirby's testimony, and only elicited information that Dr. King has not lived with his parents for some years, and his parents did not know he viewed porn. *Id.* at 29-30.

Finally, the defense called Jake Grobe, Dr. King's father-in-law. *Id.* at 31. Jake testified that he would serve as a third-party custodian to his son Lucas and his grandchild. *Id.* at 32. Jake testified that both he and his wife are retired and have the ability to provide full-time supervision. Jake testified that he knew Dr. King would not be allowed contact with any minor if released, and Jake would notify Pretrial and the police if there was a violation. *Id.*

On cross-examination, the government did not rebut any testimony, and instead elicited information that Jake too was surprised by the government's allegations, and Jake was not familiar with certain social media applications referenced in the complaint. *Id.* at 33-36.

### 3. Defense counsel showed there are conditions of release that can assure community safety

Defense counsel next argued for Dr. King's release to the court. *Id.* at 36. Defense counsel first highlighted that certain conditions had already been put in place to ensure the safety of Dr. King's son and that the internet had been disconnected and internet-capable devices removed from the house. *Id.* at 36. Defense counsel explained that Dr. King's proposed custodians were strong assurances that would eliminate any concerns of danger to the community. Defense counsel further addressed the uncharged and unproven online chats, explaining that what the government "failed to inform the Court of is that FBI agents have scanned the country and interviewed" numerous people, "and there is not one person that corroborates that that occurred." *Id.* at 37-38. Defense counsel also highlighted the character letters submitted by others, showing that Dr. King "has unimpeached character." *Id.* at 39. Finally, defense counsel shared that Dr. King is

willing to post a significant bond to ensure he complies with all of the court's conditions. *Id.* at 40. Defense counsel ended by requesting release with extensive conditions.

### 4. The government responded with unspecified and unreasoned concerns

The court allowed the government to respond. *Id.* at 40. The government agreed that Dr. King had "tons of people in his corner," but that meant nothing to the government because they accused him of sending the chats. *Id.* at 41. Regarding its extensive investigation into the chats, the government argued "proving a negative is a very difficult thing," agreeing that it has no evidence to corroborate the chats. *Id.* Finally, in addressing the *Monfre* case, the government argued that "Wi-Fi is readily accessible, and it's free. You can go to a public park and find it or to a Starbucks. That wasn't the case in 2009." *Id.* at 42. The government again failed to show whether there were any Starbucks or public parks around Dr. King's residence or how he would access this free Wifi if placed on home confinement.

### D. The magistrate judge found no conditions of release could reasonably assure community safety in Dr. King's case

After the hearing, the magistrate judge made an oral ruling. *Id.* at 43. The magistrate judge found that Dr. King did not rebut the presumption of detention as to dangerousness. *Id.* at 44. The court found the allegations against Dr. King disturbing, including the allegations related to Dr. King's son. *Id.* at 45. However, the court never explained how those concerns could not be mitigated with the proposed conditions, including the third-party custodians. Rather, the magistrate judge said that she found support for her decision in *Grooms*. *Id.* at 47.

The court quoted a passage from *Grooms* that "Internet or Internet-capable devices certainly has some appeal, but they are in reality notoriously difficult to enforce." *Id.* at 48. The magistrate judge reasoned that "[m]ost TV's are Internet-capable, and free Wi-Fi is often available from areas surrounding a home even if a home's Internet subscription is discontinued." Id. at 48. The magistrate judge's vague reasoning was not specific to the area surrounding Dr. King's home, and in fact, ignored Lucas' unrebutted testimony that no internet-capable devices were in the home.

Finally, the court distinguished the *Monfre* case by stating that Dr. King was not in treatment (ignoring fact that Dr. King recently completed an evaluation with a forensic psychologist); that the allegations against Dr. King were "consistent" (ignoring the fact that the government could in no way corroborate the online chats); the allegations against Dr. King were "fresh" (ignoring the fact that the charged conduct occurred in September 2023); and probation recommended detention for Dr. King, which is no doubt based on the personal opinion of the officer who conducted Dr. King's pretrial report. *Id.* at 48-50.

On April 2, 2024, the magistrate judge issued a written order with the same reasoning, dkt. 24, but appeared to copy and paste some of the passages from the government's filing. *Compare* dkt. 14 at 9 *with* dkt. 24 at 3.

Dr. King requests this Court revoke the magistrate judge's detention order and grant him release with appropriate conditions. Dr. must be released because the magistrate judge erred when she found that the government showed by clear and convincing evidence that *no* conditions of release could reasonably assure the

community's safety. There are conditions of release that can eliminate any risk to the community posed by Dr. King.

## II.   MEMORANDUM OF POINTS AND AUTHORITIES

This Court should revoke the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b) and release Dr. King with appropriate conditions. Section 3145(b) states "[i]f a person is ordered detained by a magistrate judge" then the person may file "a motion for revocation or amendment of the order."

Here, the Court should revoke the magistrate judge's detention order and release Dr. King with appropriate conditions for the following four reasons: (A) Dr. King rebutted the presumption of detention based on his family support, education, employment, community ties, lack of criminal history, third-party custodians, low-risk status, and proposed conditions of release; (B) there are conditions of release that can reasonably assure the community's safety in Dr. King's case; (C) the government failed to carry its burden that there are *no* conditions of release that can reasonably assure the community's safety; and (D) the magistrate judge erred when it found that no conditions of release could reasonably assure community safety. Finally, (E) the defense offers proposed conditions for Dr. King's release.

### A. Dr. King rebutted the presumption of detention based on his family support, education, employment, community ties, lack of criminal history, third-party custodians, low-risk status, and proposed conditions of release

Section 3142(e)(3) creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3). However, "[a]ny evidence favorable to a defendant that comes within a category listed

in § 3142(g)" can rebut the presumption, including evidence of family support, employment status, ties in the community, a clean criminal record, or other types of evidence encompassed in § 3142(g)(3). *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

Indeed, as long as a defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight and dangerousness is definitively rebutted. *Id.* at 707; *see also United States v. Wilks*, 15 F.4th 842, 846–47 (7th Cir. 2021) (explaining the rebuttable presumption "places a light burden of production on the defendant, but the burden of persuasion always rests with the government and an unrebutted presumption is not, by itself, an adequate reason to order detention."); *United States v. Clemon*, No. 3:21-CR-30003-DWD-4, 2022 WL 2756183, at *4 (S.D. Ill. July 14, 2022) ("The burden of production is not a 'heavy one' and can consist of evidence relating to 'marital, family and employment status, and other types of evidence encompassed in § 3142(g)(3).'").

Here, Dr. King definitively rebutted the presumption of detention with evidence of his strong family support, his extensive education, his impressive employment history, his clean criminal record, his willingness to engage in treatment, his low-risk of sexual victimization, and his credible third-party custodians. Such evidence certainty rebuts the presumption and shows that there are conditions of release that can reasonably assure community safety. *See Dominguez*, 783 F.2d at 707.

## B. There are conditions of release that will reasonably assure community safety in Dr. King's case

Dr. King must be released because the government has failed to show there are *no* conditions that will reasonably assure the community's safety. "A defendant cannot be

detained as dangerous under § 3142(e), even if the presumption is not rebutted, unless a finding is made that no release conditions 'will reasonably assure the safety of the community.'" *Dominguez*, 783 F.2d at 707. "That finding cannot be based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *Id.*

Relying on its own allegations of past danger, the government set forth two overarching risks to the community: (1) in-person contact with minors, including Dr. King's son; and (2) online contact with minors. Although there is no likelihood of future misconduct by Dr. King, each of these risks can be eliminated with a combination of release conditions.

First, Dr. King's in-person access to minors can be eliminated by (a) ordering that Dr. King have no contact with minors, including his son; (b) requiring that Dr. King's son lives in a separate home, (c) confining Dr. King to his separate home with GPS monitoring, (d) appointing Lucas King, Kirby King, Tina King, Jake Grobe, and Deborah Grobe as third-party custodians, and (e) granting Pretrial Services access to the home's ring camera to monitor who is coming and going from the residence. Together, these conditions would eliminate any risk to minors within the community. If Dr. King cannot leave his home, children cannot visit his home, and any violation will be reported, the court has eliminated any in-person risk to minors. Said differently, the court can reasonably assure the safety of the community.

There are also conditions of release that can eliminate any online risk to minors. Dr. King's online access to minors can be eliminated by (f) turning off the internet, (g)

13

taking away internet-capable devices, and (h) assigning the same third-party custodians to monitor for any violations. If Dr. King has no internet access, no device to access the internet, and any violation will be reported, the court can eliminate any risk to minors online.

Dr. King will also post a substantial bond, permit unannounced inspections of his home by Pretrial, engage in appropriate treatment, or follow any other conditions the Court imposes, thereby eliminating any risk to the community.

### C. The government has failed to carry its burden to show there are *no* conditions of release that could reasonably assure the safety of the community

Under Section 3142(e), a defendant cannot be detained unless the government proves, by clear and convincing evidence, that *no* release conditions will reasonably assure community safety. *Dominguez*, 783 F.2d at 707 (quoting § 3142(e)); *United States v. Hammond*, 204 F. Supp. 2d 1157, 1163–64 (E.D. Wis. 2002) ("When the government asserts that a defendant must be detained because he is dangerous it bears the burden of proving 'by clear and convincing evidence that no condition or set of conditions will ensure the safety of the community.'").

Here, the government failed to carry its high burden because (1) it failed to explain how all of the release conditions available to the court are insufficient to reasonably assure community safety; (2) ironclad guarantees are not required to release Dr. King; and (3) the government's cited case does not support Dr. King's detention.

14

1. **The government failed to explain how all of the release conditions available to the court are insufficient to reasonably assure community safety**

First, regardless of whether Dr. King rebutted the presumption, the government always retains the burden to prove by clear and convincing evidence that *no* release conditions will reasonably assure community safety. *Dominguez*, 783 F.2d at 707 (quoting § 3142(e)). Here, the government failed to meaningfully discuss any release conditions, let alone explain why such conditions could not protect the public in Dr. King's case.

Instead, the government argued, "[t]he Court should reject the defendant's proposed conditions of release." Dkt 14 at 10. Specifically, the government took issue with the fact that Dr. King did not propose in-home confinement, a curfew, and no domestic travel as conditions of release. *Id.*; Tran. at 6-7. But the government's argument is flawed for two major reasons.

First, Dr. King repeatedly stated in his motion to suppress and at the detention hearing that he would comply with whatever conditions the court deemed necessary, which clearly includes home confinement, a curfew, and much more. Dkt 10 at 11; Tran. at 37. That remains true today. Dr. King does not have a long history of criminal activity, disrespect for the law, or non-compliance with court orders. PSR. Rather, Dr. King has no criminal history and will follow whatever is asked of him.

Second, the legal standard under the Bail Reform Act is not whether Dr. King's proposed conditions should be accepted or rejected by the court, but rather, whether the government showed that *no* conditions can reasonably protect the public. *See Dominguez*, 783 F.2d at 707 (quoting § 3142(e)). The government clearly believes home

incarceration, a curfew, and no domestic travel are necessary conditions of release for Dr. King, yet it completely failed to explain why such conditions are not enough to protect the public. As the Seventh Circuit explained in *Dominguez*, it is not enough to show that Dr. King was a danger in the past. 783 F.2d at 707. It must show by clear and convincing evidence that Dr. King is a *future* danger, who will not follow his conditions of release, who cannot be monitored by his third-party custodians, and thus leaves the court with absolutely no way reasonably to protect the public.

Here, the government presented no evidence —let alone clear and convincing evidence— that Dr. King and his third-party custodians cannot and will not follow the court's release conditions. As stated above, there is no evidence that Dr. King will not follow the court's order, based on his unimpeached character. Further, Dr. King's third-party custodians' credibility went unimpeached when they testified that they would report any violations, and as the government itself argued, there is absolutely no evidence that Dr. King's family helped him engage in any criminal activity.

The government also did not even begin to explain how Dr. King would victimize his son who lives in a different home if Dr. King is placed on home confinement with GPS monitoring, if he is monitored full-time by his parents, and if he is prevented from any contact by Lucas and his in-laws. Similarly, the government does not even attempt to explain how Dr. King would victimize minors if there is no internet in the home, no internet-capable devices in the home, and no free Wifi in the area.

If ordered, Dr. King will stay in his home, eliminating any risk that he may pose to in-person minors. Further, if ordered, Dr. King will stay offline, eliminating any risk that

he may pose to minors online. Dr. King further welcomes any other combination of conditions the Court deems appropriate. But the government's dissatisfaction with the defense's proposal is not even close to carrying its heavy burden required to detain Dr. King pending trial.

### 2. Ironclad guarantees are not required to release Dr. King

The government's remote concern that Dr. King may be able to somehow access an unknown internet source cannot be the basis for his detention. "Section 3142 does not seek ironclad guarantees," but instead only requires reasonable assurance. *See United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal.1992); *see also United States v. Orta*, 760 F.2d 887, 891 (8th Cir.1985) (en banc) ("In this case, the district court erred in interpreting the 'reasonably assure' standard set forth in the statute as a requirement that release conditions 'guarantee' community safety and the defendant's appearance. Such an interpretation contradicts both the framework and the intent of the pretrial release and detention provision of the 1984 Act."); *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Undoubtedly, the safety of the community can be reasonably assured without being absolutely guaranteed. Requiring that release conditions guarantee the community's safety would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention.").

As in every case, there is some remote risk a defendant will commit a new crime while on bond. *See Orta*, 760 F.2d at 891–92 ("The district court's interpretation, however, virtually mandates the detention of almost every pretrial defendant: no other safeguard can 'guarantee' the avoidance of the statutory concerns."). However, the risk of

reoffending is extremely low, both generally and in this case. Generally, 98% of federally released defendants do not commit new crimes while on bond.[2] And in this case, there is no evidence that Dr. King will violate his release conditions and commit a new offense.

Nonetheless, the government argued that even if internet access was removed from Dr. King's home, there are "many, many different ways to access the Internet aside from your house." Tran. at 6. However, the government failed to name even a single way that Dr. King could access the internet from within his home with the proposed conditions.

First, and most obvious, Dr. King cannot access the internet without an internet-capable device. As Lucas testified, there are no internet-capable devices in the home, and the government in no way rebutted his testimony.

Second, there is no evidence that Dr. King's family would give Dr. King an internet-capable device. Lucas, Kirby, and Jake all testified that they would enforce the court's order and report any violations. The government in no way rebutted their testimonies.

Third, Dr. King cannot leave his home to purchase or obtain an internet-capable device if he is on home confinement, GPS-monitoring, and is monitored full-time by his retired parents and Pretrial through the ring camera. And obviously, Dr. King cannot purchase an internet-capable device from *within* his home because such a purchase would require an internet-capable device and access to a credit or debit card, which

---

[2] App. 1, AO Table H-15 (Dec. 31, 2019), available at Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

Lucas testified he has taken away. Thus, the government has failed to explain how Dr. King could access the internet without an internet-capable device.

Moreover, the government has failed to present any evidence that there is unprotected, free-to-the-public Wifi accessible from within Dr. King's home. Dr. King's home is relatively isolated and not surrounded by coffee shops, public buildings, or other places that sometimes offer free Wifi. Exhibit 1. Not to mention the fact that this type of free Wifi is often only accessible from within the building's four walls because of its short range. The government's unspecific, unreasoned, and frankly unrealistic concern that Dr. King will somehow both obtain an internet-capable device and free Wifi cannot be the reason for his detention.

### 3. The government's cited cases do not support Dr. King's detention

Finally, the government's cited cases do not support the government's arguments for Dr. King's detention. The government cherry-picked a block quote from *United States v. Hollerich* to argue that Dr. King's history and characteristics do not rebut the presumption of detention. However, if one actually reads the facts of *Hollerich*, it becomes clear that the government's block quote is both misleading and inapplicable to Dr. King's case.

In the paragraph preceding the government's block quote, the *Hollerich* court explained that "after being charged and while under supervision," Hollerich accessed child pornography from his cell phone. *United States v. Hollerich*, No. 2:22-CR-225-1, 2022 WL 16806156, at *3 (W.D. Pa. Nov. 8, 2022). The court found "[t]his demonstrates a willingness to continue to access child pornography even after being placed on

supervision. It also highlights an unwillingness or inability to refrain from such conduct, even where the Court imposed strict limitations on Hollerich's behavior." *Id.* The record in *Hollerich* also showed that the defendant used his fiancée's cell phone to communicate with a minor family member. *Id.*

> The sentences following the government's misleading block quote reads:

> Hollerich did not demonstrate to the Court's satisfaction that the suggested conditions of pretrial release would actually prevent him from obtaining an electronic device with access to the internet and consuming and/or distributing more child pornography. <u>Rather, the record only highlights his failure to cease using such devices while under the existing conditions of release and the difficulty of preventing him from doing so in the context of his particular living arrangement.</u> Further, far from rebutting the presumption of detention, evidence adduced by Hollerich highlights the danger he poses to the community—he now has an infant child who lives with him and sleeps in his bedroom.

*Id.* at *4 (emphasis added).

Clearly, none of the circumstances that led to Hollerich's detention are present in Dr. King's case. First, and most importantly, Dr. King never violated the Court's release conditions, like the defendant in *Hollerich*. If released, Dr. King would comply with any and all the conditions imposed by the Court. Moreover, Dr. King's husband, parents, and in-laws will ensure Dr. King's compliance with the Court's conditions, unlike the defendant's fiancée in *Hollerich*.

Finally, unlike in *Hollerich*, Dr. King's minor child is not living in his home, let alone sleeping in his bedroom. Lucas testified that he and his son have moved in with Lucas' parents. That testimony went unrebutted by the government. Consequently, the government's block quote from *Hollerich* is not only misleading but inapplicable to Dr. King's case.

The government similarly relies on *Grooms* to argue that Dr. King's history and characteristics did not rebut the presumption of detention, and curbing internet use is extremely challenging for third-party custodians. However, *Grooms* is similarly inapplicable.

In determining that Grooms did not rebut the presumption of detention, the district court found that "[i]n particular, Defendant has not offered evidence or even filed a response brief to meet his burden of production that he is not a danger to the community." *United States v. Grooms*, No. 22 CR 128, 2022 WL 1204861, at *2 (N.D. Ill. Apr. 22, 2022). The same is not true of Dr. King, who presented substantial evidence regarding his significant family support, extensive education, impressive employment, and lack of criminal history. Dr. King also presented multiple third-party custodians who would and could enforce the court's orders.

Further, in *Grooms*, the district court found: "[t]he crimes here involve creation, transmission and possession of vast amounts of child pornography, mental and physical abuse of children, the exploitation of children for sexual gratification, and interstate travel to solicit and obtain sexual encounters with minors." *Id.* at *3. Specifically, law enforcement determined that in 2014 the defendant had sex with a 15-year-old near a school; in 2019 the defendant communicated with a minor every night for six months and required her to send him images and videos of herself or he would "punish" her; in 2020 the defendant admitted to receiving pictures of a minor's vagina; also in 2020 the defendant had a friend drive him to Ohio where he picked up a minor, brought her back to his house, touched her vagina, and received oral sex from her; and after law

enforcement caught the defendant with the minor from Ohio in his bed, the defendant continued to communicate and receive nude images from here. *Id.* at *2-3. The same is obviously not true of Dr. King, who is charged with one count of distribution. And as defense counsel argued, there is no evidence that the online chats were anything more than puffery.

In regards to the internet restrictions, the district court in *Grooms* stated: "[w]hile in some circumstances where the risk factors are lower, these internet-restricted conditions may be appropriate. Here, Grooms's alleged criminal activity is so extensive and his persistence in continuing the conduct so intense that the Court finds that these conditions cannot mitigate the risk of danger his release poses to the community." *Id.* at *4 (emphasis added). Again, the same is not true of Dr. King. There is no evidence here that the alleged crimes here are so extensive, persistent, and intense that Dr. King will continue to pose a future danger, leaving *no* conditions of release to reasonably assure community safety. As shown above, Dr. King is willing and able to comply with any conditions of release imposed by the court.

Consequently, the government has failed to carry its heavy burden of proving by clear and convincing evidence that no conditions of release will reasonably assure community safety, and Dr. King must be released.

**D. The magistrate judge erred when it found that no conditions of release could reasonably assure community safety**

As shown above, Dr. King rebutted the presumption of detention, and the government failed to prove by clear and convincing evidence that no conditions of

release could reasonably assure community safety. Thus, the magistrate judge's order is flawed for several reasons.

### 1. The magistrate judge erred by relying on the government's misleading and inapplicable cases

First, the magistrate judge erred by relying on the government's misleading and inapplicable cases to find that Dr. King did not rebut the presumption of detention. Dkt. 24 at 2-3. It appears the magistrate judge copied and pasted the government's misleading block quote from *Hollerich* and misleading parenthetical from *Grooms*. *Compare* dkt. 14 at 9 *with* dkt. 24 at 3. As explained above, the government cases are factually dissimilar and thus inapplicable to Dr. King's case.

### 2. Other district courts have released similarly situated defendants with more serious charges

Second, the magistrate judge used the government's misleading and inapplicable cases to show that "[o]ther district courts have found similar representations insufficient to rebut the presumption of detention." *Id.* at 3. However, other courts have, in fact released similarly situated defendants with more serious charges. For example, in *United States v. Siegel*, the defendant was charged with three counts of knowingly receiving, accessing, and possessing child pornography. *United States v. Siegel*, 19-cr-00391 (N.D. Ill. May 7, 2019) (Dkt. 1). The defendant was released with an unsecured bond, a recognizance bond, a third-party custodian, placed on home confinement, ordered not to use the internet, and to disclose the charges to his employer. *Id.* at dkts. 9, 11, 14, 15. The district court also granted the defendant's motions that allowed him to use email and a computer while at work, permission to attend Thanksgiving dinner with family and child,

attend the birth and naming ceremony of his child, and travel to Arizona for vacation with his family. *Id.* at dkts. 25, 27, 29, 31, 55.

In *United States v. Starck*, the defendant was charged with three counts of transporting, and one count of possessing child pornography. 19CR00465 (N.D. Ill. June 4, 2019) (Dkt. 1). The district court released the defendant with conditions, including no use of the internet. Id. at dkts. 24, 90. When violations were reported relating to location monitoring and alcohol, the defendant's conditions were modified to home incarceration. *Id.* at dkt. 64. After this modification, there were no reported violations.

In *United States v. Novak*, the defendant was charged with two counts of receiving, one count of transferring, and one count of possessing child pornography. 19CR00475 (N. D. Ill. June 6, 2019) (Dkt. 1). He was released with conditions which included electronic monitoring. Id. at dkt. 29. There were no docket entries which indicate he violated his conditions of release.

In *United States v. Vivirito*, the defendant was charged with one count of sexual exploitation of children, one count of coercion or enticement, and three counts of receiving, possessing child pornography. 19CR00728 (N.D. Ill. May 5, 2021) (Dkt. 95). After initially being detained, the court granted the defendant's motion for reconsideration of the detention order. (Dkt. 27). The defendant was released on a secured bond with home incarceration. (Dkt. 27).

Similarly, in *United States v. Cutlerywala*, the defendant was charged with one count of knowingly persuading, inducing, or enticing a minor. 23CR181 (N.D. Ill. April 11,

2023) (Dkt. 14). The defendant was released with conditions, including home incarceration, no internet, and no contact with minors.

In *United States v. Anderson*, the defendant was charged with one count of possessing child pornography. 21CR482 (N.D. Ill. July 30, 2021) (Dkt. 1). He was released with conditions, including no contact with minors and no internet usage.

In *United States v. Frankenberger*, the defendant was charged with four counts of transporting child pornography and one count of possession of child pornography. 21CR304 (N.D. Ill. May 12, 2021) (Dkt. 1). He was released with conditions, including GPS monitoring and no access to the internet.

All of these defendants were recently charged with similar or more serious allegations than Dr. King, and the district court found there were conditions of release that would ensure the safety of the community. The same is true for Dr. King, so the Court must grant him release.

### 3. The magistrate court gave too much weight to uncharged, uncorroborated, and untrue conduct

Third, the magistrate judge gave significant weight to allegations that are uncharged, unsupported, and untrue. Specifically, the magistrate judge gave significant weight to online chats sent to other online users. However, there is absolutely no evidence that these acts actually occurred. The government had conducted an extensive and exhaustive search to determine whether the chats were true— they are not. Rather, the chats are nothing more than puffery or sexual fantasies about illicit acts with an encouraging audience.

### 4. The magistrate judge erred when she found that none of the conditions would prevent future deception

Fourth, the magistrate judge found that Dr. King "concealed his alleged illegal activities from his entire family," "and none of the proposed conditions of release would prevent this deception from continuing to occur." Dkt. 24 at 6. The magistrate judge's reasoning is flawed. Arguably, monitoring "a defendant's internet usage is extremely challenging for even the most capable third-party custodian," but that is not what is required here. As Kirby King testified, he would "make sure that [Dr. King] has no access to the Internet, to make sure that he does not leave the area, leave the house, and, third, to make sure no one under 18 years of age has access to him." Tran. at 28. Even the most unsophisticated third-party custody can determine whether Dr. King has an internet-capable device in his hand or whether Dr. King left the house. Such monitoring does not require familiarity with certain social media applications, as the government alluded to during cross-examination. It only requires simple observation of Dr. King, which his parents are able to do full-time. Moreover, now that Dr. King's third-party custodians are aware of the allegations, and aware of what behavior is and is not acceptable, they can no doubt prevent any violations from occurring.

### 5. The magistrate judge's unspecified and unreasoned concern regarding wifi does not justify detention

Fifth, the magistrate judge determined: "Even if the internet is disabled at King's home, Wi-Fi is often readily available from areas surrounding a home." Dkt 24 at 7 (citing *Grooms*, at *4). Like the government's argument, the magistrate judge's concern is both unspecified and unreasoned. On home confinement with GPS monitoring, Dr. King

cannot simply go wandering around the community looking for an internet-capable device and free Wifi. Both Pretrial and Dr. King's parents will be notified of his violation. Further, the fact that Wifi may theoretically surround *some* houses in this country is not enough to justify Dr. King's detention. The government has presented no evidence that free, unprotected Wifi is available from within *his* home. That is because there is no free Wifi accessible from within Dr. King's home. This eliminates any online risk.

### 6. Dr. King is willing and able to engage in any appropriate treatment

Finally, the magistrate judge found that "King has not engaged in or sought any type of similar professional support or therapy." Dkt. 24 at 7. However, as noted in his motion for release, Dr. King was recently evaluated by a forensic psychologist, who found that "Adam is low risk for sexually victimizing people." Dkt. 10 at 3. If permitted, Dr. King would engage in any mental health treatment deemed appropriate. Because there are conditions of release that can reasonably assure community safety, Dr. King must be released.

### E. The defense's proposed conditions of release for Dr. King

Dr. King proposes the following conditions of release:

- The court will place Dr. King on home incarceration with no movement;

- Order Dr. King to post a $75,000 secured bond;

- Lucas has moved out of the family house;

- Dr. King's parents, Kirby and Tina King, will act as third-party custodians, and they will live in the house and monitor Adam and report any violation to the court and pretrial;

- Dr. King will have no contact with anyone under the age of 18 years old, including the minor child;

- The internet at the house will be disabled;

- Dr. King will be prohibited from accessing any internet-capable device;

- Dr. King will surrender his passport and limit or prevent travel without prior authorization from this Court;

- Surrender all credit cards, debit cards, and checkbooks; and

- Permit the supervising officer to make unannounced inspections of Dr. King's residence or place of residence for the purpose of ensuring compliance with the conditions of pretrial release.

WHEREFORE, Dr. King prays that this Court revoke the magistrate judge's detention order and impose any conditions the Court believes necessary for his release.

By: s/ Jonathan S. Bedi

Jonathan S. Bedi
Dena M. Singer
Bedi & Singer, LLP
53 West Jackson Blvd, Suite 1101
Chicago, IL 60604
Phone: (312) 525-2017
jbedi@bedisinger.com
dsinger@bedisinger.com
**Attorneys for Defendant**

28

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a copy of the foregoing document was filed and served on all attorneys of record via the Court's ECF system on today's date.

s/Jonathan S. Bedi
Attorney for Defendant

Jonathan S. Bedi
Bedi & Singer, LLP
53 West Jackson #1505
Chicago, IL 60604
(p)312-525-2017
(f) 312-525-2107
jbedi@bedisinger.com