UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 24 CR 153 |
| v. | Hon. Lashonda A. Hunt |
| ADAM STAFFORD KING | |

## GOVERNMENT'S SUPPLEMENTAL MOTIONS *IN LIMINE*

The United States of America, by its attorney, Andrew S. Boutros, United States Attorney for the Northern District of Illinois, respectfully submits the following supplemental motions *in limine*:[1]

1. Motion to Bar Cross-Examination of Witnesses Regarding Matters That Are Not Probative of Truthfulness, Bias, or Motive (Opposed); and

2. Motion to Admit Telegram Records Under FRE 807 (Opposed).

## I. MOTION TO BAR CROSS-EXAMINATION OF WITNESSES REGARDING MATTERS THAT ARE NOT PROBATIVE OF TRUTHFULNESS, BIAS, OR MOTIVE (OPPOSED)

As set forth in more detail below, the government moves the Court to bar cross-examination of witnesses on matters that are not probative of truthfulness, bias, or motive, because such cross-examination is not relevant and would unnecessarily invite the jury to decide the case based on improper factors. *First*, the government anticipates calling Bryan Austermann, previously identified as the "New York Individual", who is charged with child pornography offenses in another district and who both distributed and received child pornography from defendant. Austermann also engaged in lawful

---

[1] Per the Court's instructions regarding pretrial motions in criminal cases, the government is filing its supplemental motions *in limine* in a single document. The government's consolidated motions in limine are filed at Docket #85, and additional pretrial motions are filed at Dockets #102, #104, and #120. The parties have met and conferred regarding the government's motions, and the government has noted where defendant has objected.

sexual conduct that, while legal, may be viewed unfavorably by jurors. Cross-examination of Austermann regarding his lawful conduct, as well as cross-examination regarding the granular details of his illegal conduct, should be limited to matters bearing on truthfulness, bias, or motive.

*Second*, the government anticipates calling an FBI agent (the "OCE") who forensically examined Austermann's cellphone, identified the charged child pornography exchanges with defendant, and later engaged in covert communications with defendant. In December 2025, the OCE received an administrative suspension for improper storage of evidence in a matter unrelated to, and that also predated, the current case. Cross-examination of the OCE on this matter should be barred because it is not relevant and does not pertain to the OCE's truthfulness, bias, or motive.

### A.    Legal Standard

Only relevant evidence is admissible. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action." Fed. R. Evid. 401. However, even relevant evidence may be excluded where "its probative value is substantially outweighed by a danger of…unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

Although the Confrontation Clause guarantees a defendant the right to meaningful cross-examination, that right is "not unlimited." *Sussman v. Jenkins*, 636 F.3d 329, 353 (7th Cir. 2011). Federal Rule of Evidence 611(b) provides that cross-examination should be limited to the subject matter of the direct examination and "matters affecting the witness's credibility." One of the core concerns of the

Confrontation Clause is the "ability to expose a witness's motivation for testifying, his bias, or his possible incentives to lie." *United States v. Linzy*, 604 F.3d 319, 323 (7th Cir. 2010) (citation omitted).

Outside of that core function, however, "trial judges retain wide latitude…to impose reasonable limits on. . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); *see also* Fed. R. Evid. 611(a) (directing courts to exercise "reasonable control over the mode and order of examining witnesses" to avoid wasting time and to "protect witnesses from harassment and undue embarrassment"). For that reason, the trial court's decision to limit cross-examination on matters that do not implicate the "core functions of the Confrontation Clause" will not be reversed absent an abuse of discretion. *United States v. Williams*, 892 F.3d 242, 247 (7th Cir. 2018).

When a party seeks to attack a witness's character for truthfulness through specific acts, Federal Rule of Evidence 608(b) governs. Because the "possibilities of abuse are substantial," Rule 608(b) permits inquiry on cross-examination into specific instances of conduct only if the conduct is probative of the witness's character for truthfulness or untruthfulness and is not remote in time. *See* Fed. R. Evid. 608(b) advisory committee's note to proposed rules. The rule "is intended to be restrictive" and "does not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness." Weinstein & Berger, Weinstein's Fed. Evid. § 608.22(2)(c)(i) (2d ed. 1997); *see e.g.*, *United States v. Van Dorn*, 925 F.2d 1331, 1336 (11th Cir. 1991) (precluding cross-examination about "threats to witnesses and

3

court officers" because the conduct was not relevant to the witness's truthfulness); *United States v. Bentley*, 706 F.2d 1498, 1509-10 (8th Cir. 1983) ("We cannot say the activity in question here—a drug operation—is necessarily indicative of a lack of truthfulness under the standard imposed by Rule 608.").

Even if permissible under Rule 608(b), the Court must still balance any probative value against the risks identified in Rules 403 and 611, including the danger of unfair prejudice, confusion of the issues, misleading the jury, and harassment or undue embarrassment of the witness. *See* Fed. R. Evid. 608(b) advisory committee's note to proposed rules; *see also United States v. Young*, 567 F.2d 799, 803 (8th Cir. 1977) (disallowing cross-examination of government witness concerning her alleged offer to pay $10,000 to have her husband killed, because "the proposed question was not relevant to veracity and honesty and would have been highly prejudicial"). Consistent with these limitations, Rule 608(b) also categorically prohibits the use of extrinsic evidence to prove specific instances of conduct offered to attack a witness's character for truthfulness.

**B.    The Court Should Limit Cross-Examination of Austermann**

**1.    Background Relating to Austermann**

On November 19, 2024, Austermann was charged by complaint in the Southern District of New York with one count of distribution of child pornography and one count of possession of child pornography. *See United States v. Bryan Austermann*, No. 1:24-MJ-04040-UA, at Dkt. 1 (S.D.N.Y. 2024). On December 19, 2025, the government filed an Information charging Austermann with the same offenses, and he subsequently waived prosecution by Indictment. *See United States v. Bryan Austermann*, No. 1:25-

CR-00597-VM, at Dkt. 34 (S.D.N.Y. 2025). As of February 13, 2026, Austermann has not entered into any plea or cooperation agreements with the United States Attorney's Office for the Southern District of New York or the United States Attorney's Office for the Northern District of Illinois.

On or about May 1, 2025, pursuant to court order, the government produced to defendant approximately 1,500 pages of discovery related to Austermann. Approximately 856 pages of this discovery consist of text messages and chats between Austermann and other adults. While some messages reference the participants' mutual interest in and commission of child pornography offenses, the vast majority discuss Austermann's entirely legal sexual conduct. For example, many of these messages include discussions of consensual sexual activity with adult men, past and future sexual encounters, sexual fantasies and kinks (e.g., threesomes, fisting, double penetration, homemade pornography), and matters related to sexual health.

### 2. Legal Argument Relating to Austermann

Cross-examination concerning Austermann's lawful sexual interests, experiences, and sexual health should be precluded for several reasons. First, it is irrelevant and therefore inadmissible under Rules 401 and 402. Second, it is not probative of truthfulness, bias, or motive, and is thus barred by Rule 608(b). Third, even if marginally relevant, any probative value is substantially outweighed by the danger of prejudice, harassment, and undue embarrassment to the witness, warranting exclusion under Rules 403 and 611.

Finally, while the government acknowledges that defense counsel may cross-examine Austermann about his child pornography offenses to the extent they are

5

relevant to his truthfulness, bias, or motive, the government moves to limit such cross-examination in two ways. First, the government moves to limit the extent to which Austermann's illegal activities are described to the jury, as the precise details of his illegal conduct (e.g., descriptions of child pornography that he possessed and/or distributed to others) are not probative of his character for truthfulness. Second, the government moves to bar disclosure of the specific mandatory minimum sentences associated with Austermann's charges, as such references would impermissibly invite jurors to consider sentencing consequences when determining defendant's guilt.

> ### a. The Court Should Bar Cross-Examination Regarding Austermann's Lawful Sexual Interests, Experiences, and Sexual Health

Austermann's sex life has absolutely no tendency to make any fact more or less probable. *See* Fed. R. Evid. 401. His lawful sexual preferences, fantasies, relationships, experiences, and health are wholly unrelated to the charged conduct and do not advance any legitimate theory of the case. These matters have no tendency to make any fact of consequence more or less probable and are therefore inadmissible under Rules 401 and 402.

Moreover, this evidence has no bearing on Austermann's credibility, bias, or motive and is therefore barred by Rule 608(b). Rule 608 permits cross-examination on specific instances of conduct *only if* that conduct is probative of the witnesses' character for truthfulness or untruthfulness. Austermann's sexual activity, interests, or health plainly do not bear on his honesty, nor do they demonstrate his bias, motive, or an incentive to testify falsely. As a result, Rule 608(b) precludes such questioning, as well as the admission of extrinsic evidence (such as text messages) for that purpose. *See*

*e.g.*, *United States v. McNull*, 887 F.2d 448, 453 (3d Cir. 1989) (providing that a witness's "alleged solicitations of other inmates for criminal activities" did not suggest bias against the defendant and was not probative of truthfulness).

Even assuming *arguendo* that this evidence is marginally relevant, it should be excluded under Rules 403 and 611 because the minimal probative value is substantially outweighed by the danger of unfair prejudice and undue embarrassment. Cross-examination into Austermann's private, lawful sexual life would serve no legitimate evidentiary purpose. Instead, it would risk distracting the jury and subjecting Austermann to needless harassment and embarrassment. Rules 403 and 611 exist precisely to prevent such misuse of cross-examination.

### b. The Court Should Limit Cross-Examination Concerning Austermann's Child Pornography Offenses

The government does not contest that defense counsel may cross-examine Austermann regarding his pending charges and cooperation, including the fact that he has provided information and testimony to the government, and that he may expect to receive leniency as a result of that cooperation. Such inquiry is proper. However, cross-examination must be limited in two ways: first, to limit the extent to which Austermann's involvement in other illegal activities are described to the jury, and second, to prevent disclosure of the specific statutory penalties or mandatory minimum sentences associated with Austermann's charges.

### i. The Court Should Limit the Extent to Which Austermann's Involvement in Other Illegal Activities Are Described to the Jury

Evidence of Austermann's involvement in child pornography offenses is relevant to bias and motive, insofar as he faces federal charges and may expect a benefit in exchange for his cooperation. That said, while cross-examination on that topic is appropriate, a detailed recounting of Austermann's crimes is not. As the Seventh Circuit has explained, the "right to confrontation is not implicated where limits on cross-examination did not deny the defendants the opportunity to *establish* that the witnesses may have had a motive to lie" but rather, "denied them the opportunity to *add extra detail* to that motive." *Linzy*, 604 F.3d at 324 (emphasis in original); *see also Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009 ) (no abuse of discretion where trial court limited cross-examination about the specific nature of cooperating co-defendant's murder warrant where jury was apprised of his prior convictions, drug activity, guilty plea, alias use, and arrest warrant concerning a "serious felony offense"). The Seventh Circuit has likewise emphasized that "the Confrontation Clause does not a give a defendant a boundless right to impugn the credibility of a witness." *United States v. Clark,* 657 F.3d 578, 584 (7th Cir.2011).

Additionally, to the extent defense counsel seeks to introduce text messages reflecting Austermann's child pornography offenses (apart from those involving the defendant), the government further moves to preclude counsel from reading, admitting, or publishing those text messages at trial. Such evidence is irrelevant under Rules 401 and 402 and unduly prejudicial and cumulative under Rules 403 and 611. These out-of-court statements are also inadmissible hearsay under Rules 801 and 802

8

because they would be offered for the truth of the matters asserted, and no exception applies. Finally, admission of the text messages—particularly if the New York Individual admits his child pornography offenses—would violate the prohibition on extrinsic evidence. *See* Fed. R. Evid. 608(b), 613(b); *United States v. Nichols*, No. 15 CR 756-1, 2019 WL 398775, at \*30 (N.D. Ill. Jan. 31, 2019), *aff'd*, 77 F.4th 490 (7th Cir. 2023) (upholding exclusion of extrinsic evidence showing witness holding a gun where witness testified that she was not law abiding and defendant had already successfully impeached her on other grounds); *United States v. Taylor*, 27 F.3d 568 (6th Cir. 1994) (finding extrinsic evidence of taped confession "was not admissible as a prior inconsistent statement" under Rule 613(b) where taped confession and witness's testimony at trial were not inconsistent).

### ii. The Court Should Bar Disclosure of the Specific Statutory Penalties and Mandatory Minimum Sentences Associated with Austermann's Charges

The Court should also bar cross-examination on the specific statutory penalties and mandatory minimum sentences associated with Austermann's pending charges. While the jury may properly learn that Austermann faces serious charges and has an incentive to cooperate, knowledge of the precise sentencing consequences and mandatory minimums is unnecessary to assess credibility and presents a substantial risk of unfair prejudice. *See Shannon v. United States*, 512 U.S. 573, 586 (1994) (recognizing that "as a general matter, jurors are not informed of mandatory minimum or maximum sentences"); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997) (rejecting defense request to inform jury of mandatory minimum penalty in narcotics

case and reasoning that the jury had no sentencing function and no statute required the jury to be informed of the consequences of its verdict); *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) (upholding exclusion of cross-examination of cooperating witness "about the penalties they faced without their plea bargains" because such testimony "would have added very little to the information the jury already had").

The risk is especially acute here, because the defendant in this case is also charged with distribution of child pornography. If the jury hears that distribution carries a five-year mandatory minimum sentence and a twenty-year maximum sentence, jurors may improperly impute that penalty to the defendant and allow considerations of punishment to influence their verdict. Such speculation directly contravenes well-settled law that juries must not concern themselves with sentencing consequences when determining guilt. *See Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000) (information regarding sentencing should be withheld from the jury, whose role is to decide whether defendant is guilty). The government expects that the Court will give the jury an instruction that penalties are for the Court to consider and the government previously filed an unopposed motion to bar evidence or argument about the penalties defendant faces. *See* Dkt. 85. Allowing cross examination of the New York Individual on this topic would be nothing more than a clever (yet impermissible) attempt at an end-run around the pattern jury instruction and the government's prior unopposed motion *in limine*.

Disclosure of the specific mandatory minimum and statutory maximum sentences associated with Austermann's charges would also risk confusing the issues and diverting the jury from its fact-finding role. The probative value of such evidence

is minimal because the jury can fully understand Austermann's motive to cooperate without knowing the precise sentence he faces. Thus, reasonable limits on cross-examination are warranted to permit inquiry into the fact of cooperation and anticipated leniency, while precluding reference to specific sentences that would improperly inject those considerations into the jury's deliberations.

### C.   The Court Should Bar Cross-Examination of the OCE on an Unrelated Disciplinary Finding

#### 1.   Background on the OCE

At trial, the government anticipates calling the OCE to testify that on October 5, 2023, FBI agents, including the OCE, executed a search warrant at Austermann's residence, seized and forensically examined his cellphone, and discovered communications between Austermann and an individual using the Telegram username @pervchidude. Those communications reflect that on or about September 11, 2023, the users exchanged approximately ten videos of child pornography (five each). The OCE forensically recorded a video documenting the September 11, 2023 Telegram exchange, portions of which the government anticipates introducing at trial. Following the search, the OCE obtained consent to assume control of Austermann's Telegram account. Between November 2023 and February 2024, the OCE thereafter communicated with @pervchidude over Telegram and obtained biographical information that led law enforcement to identify @pervchidude as defendant. On December 11, 2023, defendant sent the OCE one additional video of child pornography.

In February 2023—eight months before the OCE's involvement in this case— the FBI's Office of Professional Responsibility ("OPR") initiated an internal review of

members of the OCE's FBI squad (the "Squad") following a cyber intrusion into the Squad's laboratory network. The review concerned Squad-wide practices for handling, documenting, and storing digital evidence and led to an administrative inquiry into several Squad members, including the OCE.[2] While that inquiry was pending, the government moved to preclude cross-examination of the OCE on the matter. *See* Dkt. 120. The inquiry has since been adjudicated, and the government now moves to withdraw its prior motion and submits this one instead.

As reflected in an OPR Penalty Letter dated December 2, 2025 (the "Penalty Letter"),[3] the Squad handled and extracted large volumes of digital evidence in a shared squad laboratory (the "lab"). Due to longstanding funding and storage limitations, the Squad routinely stored extracted data, including master copies of digital evidence, on shared systems located in the lab, rather than on individual hard drives maintained in an Evidence Control Facility, as required by FBI policy.[4] The inquiry determined that the OCE failed to properly store master copies of extracted data from digital evidence in an Evidence Control Facility. As a result, the OCE was suspended without pay for five days. As reflected in the Penalty Letter, the conduct at issue predated the OCE's involvement in the charged case and did not involve allegations or findings of dishonesty, false statements, evidence fabrication,

---

[2] OPR opened an administrative inquiry into one of the Squad members on August 24, 2023. OPR added the OCE and several other Squad members as subjects of the administrative inquiry in approximately December 2023.

[3] The government has made the Penalty Letter available to the defense for inspection, and defense counsel have scheduled to review the letter on February 19, 2026.

[4] According to the Penalty Letter, under Section 4.3.6 of the FBI's *Digital Evidence Policy Guide*, a "master copy" is a required copy of the original digital evidence that "must be saved on media (e.g. DVD-R, CD-R, or hard drive)," logged on an FBI Evidence Chain of Custody Form, and "retained in an Evidence Control Facility."

obstruction, or misconduct related to testimony, nor did it identify any bias, motive to fabricate, or credibility concerns relevant to this case.

<div align="center">

**2.    Legal Argument Relating to the OCE**

</div>

The government moves to preclude cross-examination concerning the OPR investigation and findings relating to the OCE for three reasons. First, the OPR matter is wholly unrelated to the charged conduct and is not probative of the OCE's truthfulness, bias, or motive, rendering it inadmissible under Rules 401, 402, and 608(b). Second, even if marginally relevant, any probative value is substantially outweighed by the dangers of unfair prejudice and juror confusion, warranting exclusion under Rule 403. Third, the OCE's credibility is not genuinely in dispute, further eliminating any legitimate impeachment value of this evidence.

<div align="center">

**a.    The Court Should Bar Evidence Concerning the OPR Investigation Because it is Irrelevant and Not Probative of Truthfulness, Bias, or Motive**

</div>

Evidence of the OPR investigation and finding about the OCE's storage of digital evidence is wholly unrelated to any fact of consequence in this case and is therefore inadmissible. *See* Fed. R. Evid. 401, 402. The OPR investigation arose from a February 2023 cyber intrusion into the Squad's laboratory network and addressed Squad-wide evidence storage practices in effect months before the October 5, 2023 search of Austermann's residence that led to the investigation of defendant.

The Penalty Letter confirms that the OCE merely "failed to properly store a master copy in an [Evidence Control Facility]." This finding did not involve the collection, preservation, forensic examination, or authenticity of the evidence at issue in this case, nor did it relate to the OCE's conduct in carrying out the charged

<div align="center">

13

</div>

investigation. It also did not involve dishonesty, false statements, fabrication of evidence, or obstruction. Additionally, the digital evidence storage practices investigated by OPR did not affect any evidence in this case, and there is notably no suggestion to the contrary.

Because the OPR matter is unrelated to both the charged conduct and the OCE's character for truthfulness, it is irrelevant under Rules 401 and 402 and cannot be used for impeachment under Rule 608(b). *See United States v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007) (affirming district court's denial of cross-examination about police officers' prior reprimands for neglect of duty under Rules 401 and 402 because such evidence "did not bear on [the officers'] character for truthfulness"); *United States v. Horsford*, 422 F. App'x 29, 30 (2d Cir. 2011) (summary order) (precluding cross-examination of police officer about administrative complaint where "the underlying conduct involved no dishonesty"). Allowing cross-examination on this matter would constitute improper impeachment on a collateral matter and would serve only to confuse the jury and unfairly prejudice the OCE.

>    **b.** **The Court Should Bar Cross-Examination About the OPR Investigation Because it is More Prejudicial Than Probative**

Even if the Court finds any marginal relevance in the OPR matter, exclusion is warranted because any probative value of the evidence is substantially outweighed by the dangers of unfair prejudice and juror confusion. *See* Fed. R. Evid. 403. Introducing evidence of the OPR investigation could lead the jury to draw the improper inference that the OCE's evidence storage practices in an unrelated matter (discovered and addressed months before the OCE's interaction with the evidence or defendant in this

14

case) reflect dishonesty or impropriety in the investigation of Austermann and/or defendant, a conclusion that is both unsupported and misleading. This risk is compounded by the temporal disconnect between the OPR conduct and the charged investigation into defendant, which began approximately eight months later.

### c. The Court Should Bar Cross-Examination About the OPR Investigation Because the OCE's Credibility Is Not Genuinely in Dispute

Exclusion is further warranted because the OCE's credibility is not genuinely in dispute. The Seventh Circuit has recognized that even evidence implicating a law enforcement witness's character for truthfulness has "no probative value at all" where the defendant does not contest the witness's account of the relevant events but instead argues that someone else committed the charged conduct. *See United States v. Seymour*, 472 F.3d 969, 971 (7th Cir. 2007) (impeachment evidence properly excluded where it had "no probative value" because defendant argued only that "someone else had planted" evidence and officer's credibility was thus "not in issue").

Here, as reflected in defendant's pretrial filings, defendant does not deny that the OCE discovered Telegram communications containing child pornography on Austermann's cellphone, or that the OCE assumed Austermann's Telegram identity and elicited identifying information from the user of the @pervchidude account. Rather, defendant's purported defense is that his identity was stolen and someone else was using the @pervchidude account. Because defendant disputes only who used the @pervchidude account, not what the OCE did or observed, inquiry into the unrelated OPR investigation has no probative value and serves no legitimate impeachment purpose. The OPR investigation and Penalty Letter should therefore be excluded.

15

## II. MOTION TO ADMIT TELEGRAM RECORDS UNDER RULE 807 (OPPOSED)

### A. Background

On October 1, 2024, and FBI Special Agent served Telegram with a subpoena dated September 27, 2024, seeking subscriber information for Telegram account @pervchidude. Ex. A, Subpoena. A letter accompanying the subpoena requested that Telegram provide a declaration certifying that any records produced were maintained in the course of a regularly conducted business activity. The subpoena was transmitted electronically to Telegram's designated law enforcement email address.

On October 18, 2024, Telegram produced responsive subscriber records by return email from the same email address. Those records identified the @pervchidude account's user number, handle, associated phone number, account name, associated IP address, and last login time. Telegram did not provide the requested certification of authenticity. Ex. B, Telegram production.

On January 23, 2026, an FBI Special Agent served Telegram with a second subpoena, accompanied by a letter again requesting a certification for the previously produced records as records of a regularly conducted activity. Telegram acknowledged receipt of the letter and subpoena, but as of February 13, 2026, Telegram has not provided a declaration.

Telegram is headquartered in Dubai and has no physical presence in the United States. As reflected in its subpoena response, Telegram expressly disclaims that it is subject to United States jurisdiction. Ex. B ("[W]e are voluntarily providing this reply and/or the enclosed information…[but] are not conceding that we are subject to U.S. jurisdiction for this or any other request or any purpose").

16

### B.    Legal Argument

Trial courts have "considerable" discretion in determining whether evidence is admissible under Federal Rule of Evidence 807, and reversal is warranted only for "clear and prejudicial error." *United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016) (citation omitted). Rule 807 permits admission of a hearsay statement that: (1) is supported by "sufficient guarantees of trustworthiness," (2) is more probative on the point for which it is offered than other reasonably obtainable evidence; and (3) is disclosed with adequate pretrial notice. Fed. R. Evid. 807; *see also Moore*, 824 F.3d at 622.[5] The Rule is intended to admit evidence that satisfies the "spirit" of the hearsay exceptions where strict compliance is impracticable. *See United States v. McPartlin*, 595 F.2d 1321, 1350 (7th Cir. 1979); *see also United States v. Banks*, 514 F.3d 769, 777 (8th Cir. 2008) ("Rule 807 allows for the admission of hearsay not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness.") (internal quotation marks omitted). The Telegram subscriber records satisfy each of these requirements.

### 1.    The Telegram Records Are Supported by Sufficient Guarantees of Trustworthiness

In assessing trustworthiness under Rule 807, courts must consider the "totality of circumstances under which [the statement] was made" as well as any evidence "corroborating the statement." Fed. R. Evid. 807. Telegram produced the records

---

[5] *Moore* articulated a five-element test for admission of hearsay evidence under Rule 807, including materiality and service of the interests of justice. However, Rule 807 was amended approximately three years later to eliminate those requirements as redundant of Rules 102 and 401, leaving trustworthiness, comparative probative value, and notice as the operative elements for admission. *See* Fed. R. Evid. 807 advisory committee's note to 2019 amendment.

directly to the government from its official law enforcement email address in response to a federal subpoena seeking subscriber information for a specific account. The records contain technical data that Telegram routinely collects and has no incentive to fabricate, including IP address, last login time, and phone number.

The records are also strongly corroborated by independent evidence. Telegram reported that the @pervchidude account logged in approximately eight hours before the search of defendant's residence using an IP address assigned to his residence. A forensic extraction of defendant's cellphone showed that the Telegram application was deleted mere seconds before the FBI seized defendant's cellphone from defendant, who at the time was hiding in his bathroom. In addition, a review of defendant's Scruff messages, which were extracted from his cellphone, revealed that defendant identified his Telegram username as @pervchidude to other Scruff users on 68 occasions between February 11, 2023 and January 6, 2024. The phone number associated with the Telegram account also traced to one of defendant's former co-workers, who reported that defendant frequently used her cellphone at work.

Taken together, these facts provide ample guarantees of trustworthiness sufficient to satisfy Rule 807, and courts have admitted similarly reliable and independent corroborated records under 807. *See e.g.*, *Moore*, 824 F.3d at 624 (vacating district court's order excluding probation records and notes of probation officer and finding such records admissible under Rule 807); *United States v. Dumeisi,* 424 F.3d 566 (7th Cir. 2005) (admission of Foreign Intelligence file proper under Rule 807); *Banks,* 514 F.3d 769 (admission of ATF Form 4473 under Rule 807).

### 2. The Telegram Records Are More Probative Than Any Reasonably Obtainable Alternative

The Telegram records are more probative on the issue of defendant's use and control of the @pervchidude account than any other evidence reasonably available to the government. Because Telegram was deleted from defendant's cellphone immediately before the cellphone's seizure, the government lacks direct device-based evidence tying defendant to the @pervchidude account. The subscriber records showing a recent login to the account from defendant's residence shortly before the search and seizure are therefore uniquely probative.

The government has made repeated efforts to obtain a business-record certification from Telegram, but Telegram has refused to provide one. Because Telegram is a foreign company with no physical presence in the United States and expressly disclaims United States jurisdiction, the government cannot compel a custodian to appear at trial to authenticate the records. Under these circumstances, the records produced by Telegram are the most probative evidence reasonably obtainable, satisfying Rule 807's necessity requirement.

### 3. The Government Has Provided Adequate Notice

The Telegram records were produced to the defense in 2024, and this motion provides written notice of the government's intent to offer the records at trial. Rule 807's notice requirement is therefore satisfied.

### 4. Admission Does Not Implicate the Confrontation Clause

Admission of the Telegram records does not violate the Confrontation Clause because the records are not testimonial. Under *Crawford v. Washington*, 541 U.S. 36

(2004) and its progeny, the Sixth Amendment applies only to statements made with the primary purpose of establishing or proving past events for use in a criminal prosecution. *See also Davis v. Washington*, 547 U.S. 813, 822 (2006). Business records created for the administration of an entity's affairs are not testimonial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).

Telegram's subscriber records are created and maintained to manage user accounts, improve security, and enforce Telegram's Terms of Service—not to generate evidence for prosecution. Telegram's Privacy Policy confirms that it collects metadata such as IP addresses, devices, and username history to improve account security, as well as to "prevent spam, abuse, and other violations of [Telegram's] Privacy Policy." *See* Ex. C at 6. Telegram also publicly emphasizes its distributed infrastructure and its resistance to government data requests, further underscoring that its records are not maintained for prosecutorial purposes. *See* Ex. D at 6.

<div style="margin-left:40%">

Respectfully submitted,

ANDREW S. BOUTROS
UNITED STATES ATTORNEY

By:    */s/ Asheeka Desai*
     ASHEEKA DESAI
     PRASHANT KOLLURI
     Assistant United States Attorneys
     219 South Dearborn Street, 5th Floor
     Chicago, IL 60604
     (312) 353-5300

</div>